Jerry Lee GARRISON, by his duly appointed guardian and curator, Joseph Garrison, Respondent,

v.

R. D. RYNO, d/b/a R. D. Ryno Motor Sales, and C. H. Kent, Appellants.

No. 47272.

Supreme Court of Missouri,
Division No. 1.

Nov. 9, 1959.

Highway 66 at the scene of the collision runs east and west. Road W runs north and south. From the intersection visibility to the east is good for 2,000 feet. Visibility to the west is good for ¾ mile, to the top of a hill. It is upgrade approaching the intersection on Road W from the north. Highway 66 is a two-lane 24-foot wide concrete highway. Road W is a gravel road, blacktopped for some 400 feet north of the intersection. Road W broadens to a width of 70 or 80 feet where it intersects Highway 66. There was a stop sign on the west side of Road W, north of the intersection, for southbound traffic on Road W.

The collision occurred at 7 p. m. on January 18, 1955. It was dark. The roads were "very slick" with ice and snow. Plaintiff, a passenger in a 1949 Plymouth driven by James Newman, was seated in the front seat between Newman and Jimmy Boswell. The three were traveling west on Highway 66, bound for Springfield. Defendant Kent was driving a two-car unit consisting of two new automobiles connected by a tow-bar. He was transporting the tow-bar unit from Toledo, Ohio to Fort Worth, Texas. After stopping for food at a cafe 400 feet north of the intersection Kent drove the tow-bar unit south on Road W, 400 feet to the intersection and then turned right or west on Highway 66, toward Springfield. Carl Spencer, an employee of Powell Brothers Truck Line, was driving one of its tractor-trailer units east on Highway 66. The westbound Newman Plymouth collided with the eastbound Powell tractor-trailer unit at the west edge of the intersection. There was no contact between the Newman Plymouth and the tow-bar unit driven by Kent.

When the Newman Plymouth, traveling about 25 m. p. h., was 400–500 feet east of the intersection Newman saw "several sets" of taillights 40 or 50 feet off to the north side of Highway 66, coming south on Road W, "sort of southwest," "veering in a southwesterly direction," approaching the intersection, moving "very slow."

Allen, Woolsey & Fisher, Russell G. Clark, Springfield, for appellants.

Neale, Newman, Bradshaw, Freeman & Neale, Jean Paul Bradshaw, Paul L. Bradshaw, Springfield, for respondent.

HOUSER, Commissioner.

Jerry Lee Garrison, a minor, acting through his guardian and curator, filed suit against Powell Brothers Truck Line, Carl Spencer, R. D. Ryno, doing business as R. D. Ryno Motor Sales, and C. H. Kent for personal injuries sustained in a vehicular collision which occurred at the junction of U. S. Highway No. 66 and County Road W. in Webster County. Plaintiff eventually dismissed as to Powell Brothers Truck Line and Spencer and proceeded to trial against Ryno and Kent. Trial before judge and jury in the Circuit Court of Greene County resulted in a verdict and judgment for $50,000 for plaintiff and against defendants Ryno and Kent, who have appealed.

"They proceeded southwest." Newman did not then see the vehicle to which the taillights were attached, nor did he see any headlights. He saw only taillights, but saw them clearly—not "the complete round," just taillights. He was in such position in his car and the vehicles were in such position that he clearly and distinctly saw the round taillights—more than one set of them—one set ten feet behind the other: "bright red taillights." At about the same instant he saw headlights on the oncoming eastbound Powell Brothers tractor-trailer unit, which was then about the same distance from the intersection as the Newman Plymouth (450 feet). At 25 m. p. h. Newman could have stopped the Plymouth within 300 feet under the icy conditions then prevailing, but he did not change the operation of the Plymouth in any way at that point, seeing no need at that time to do anything. Newman had travelled that highway many times and he knew about the stop sign for southbound traffic on Road W. He thought the vehicle approaching from the north was going to stop at the stop sign, but the taillights continued moving in a southwesterly direction. It first became apparent to Newman that the taillights approaching from the north were not going to stop when the Newman Plymouth was about 200 feet away. Without stopping for the stop sign the taillights continued on out onto Highway 66, then moved in a straight westerly direction. After getting out onto Highway 66 the vehicles on which the taillights were mounted either came to a stop or proceeded so very slowly that the difference was imperceptible to Newman. The Newman Plymouth was about 200 feet east of the intersection when the taillights came out onto Highway 66. Newman could then distinguish the vehicles to which the taillights were attached as automobiles. After the vehicles with the taillights drove out onto Highway 66 Newman applied the brakes on the Plymouth three separate times. The first time the Plymouth started skidding. It did the same thing the second time. By the time he applied the brakes the third time he was "so close" (to

the taillights, which were completely blocking the westbound lane) that Newman was confronted with a situation where he either had to attempt to stop, or cross to the other lane, or go over an embankment on the right-hand side of the highway. The taillights were then "a short distance" in front of the Plymouth; "real close"; "probably about four car lengths, or so." By that time the headlights on the oncoming eastbound tractor-trailer unit "were right there." Newman applied the brakes the third time and the Plymouth skidded over into the eastbound lane and into the path of the eastbound tractor-trailer unit, which struck the left front of the Plymouth. The taillights of the tow-bar unit were four or five car lengths west of the intersection when the collision occurred. All of the occupants of the Plymouth were thrown out of the car. Jimmy Boswell was instantly killed. Severe personal injuries were inflicted upon plaintiff.

■■ Appellants' first point is that there was no substantial evidence that Kent was negligent or that such negligence was the direct and proximate cause of the collision, in that respondent's only testimony that Kent pulled onto Highway 66 when the Plymouth was so close as to constitute an immediate hazard was so contrary to physical laws and facts of common knowledge that it could not be accepted as substantial evidence. Appellants refer to respondent's testimony that the direction in which the tow-bar unit was headed was south, directly toward Highway 66, claiming that there was no evidence that the unit did not approach the highway directly (i. e. at right angles); that it is a law of physics that a beam or reflection from a light will travel in a straight line; that Newman's testimony that he saw taillights and no headlights leads to only one conclusion, namely, that the taillights he saw were facing the direction from which Newman was traveling, i. e. east, and that the taillights he saw were on the rear of a vehicle traveling west on Highway 66, so that the tow-bar unit must already have been on the highway when Newman first saw

it. Appellants say that Newman's testimony therefore has no probative value on the issue of when the tow-bar unit pulled onto the highway in relation to the approach of the Newman Plymouth. Where testimony, beyond any reasonable doubt, is contrary to established physical facts or laws and facts of common knowledge it cannot be accepted as substantial evidence, Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, but courts are reluctant to say that declared facts are manifestly impossible or untrue, Doyle v. St. Louis Merchants' Bridge Terminal Ry. Co., 326 Mo. 425, 31 S.W.2d 1010, and should not indulge in arbitrary deductions from physical laws and facts except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other conclusion. Lansford v. Southwest Lime Co., Mo.Sup., 266 S.W. 2d 564 and cases cited. The basic premise of the argument (that the tow-bar unit was approaching the intersection at right angles) is not an established fact. The testimony most favorable to plaintiff is that as the tow-bar unit approached the intersection it was proceeding in a *southwesterly* direction, which would more effectively have displayed the lights to one approaching from the east. We cannot say that this testimony is manifestly impossible or untrue, or beyond any reasonable doubt contrary to physical facts or laws. Reasonable minds might conclude that on a dark night a beam or reflection from a red taillight or from two sets of red taillights approaching an intersection at an angle, 40 or 50 feet from the intersection, might be seen from a point on the intersecting highway 400 to 500 feet distant from the intersection; that the headlights of such a vehicle might not be noticed, where the vehicle was going upgrade as it approached the intersection—that the beam of the headlights would be cast up into the air rather than down upon the road.

Appellants further maintain that respondent's evidence showed as a matter of law that Newman's negligence "in allowing his car to skid into the left hand lane of the pavement" was the sole proximate cause of the casualty; that "there is nothing in the evidence * * * that would indicate that he could not have stopped his car before running into the rear of the tow-bar unit * * *." This argument is based upon two assumptions that cannot be made: (1) that Kent's negligence had no causal connection with the occurrence of the collision (which cannot be declared as a matter of law, it being a jury question whether Kent's acts constituted negligence and whether that negligence was a contributing cause), and (2) that there is an absence of evidence that Newman could not have stopped his car before running into the rear of the tow-bar unit (but there *was* evidence that when it became apparent to Newman that the tow-bar unit was going to enter the highway without stopping the vehicles were 200 feet apart, and that under the prevailing conditions the stopping distance for the Plymouth was 300 feet).

■ Appellants' second point is that there was no substantial evidence of agency so as to make the doctrine of respondeat superior applicable as between Ryno and Kent; that under the evidence Kent was an independent contractor, as a matter of law. There was evidence from which the jury could find the following facts with reference to agency: R. D. Ryno of Fort Worth, Texas operated an automobile sales business as an individual under the name of Ryno Motor Sales. He also was president of Midwest Leasing Corporation, a Texas corporation formed for the purpose of purchasing and leasing automobiles. From time to time he would make purchases of automobiles in distant cities and send drivers to drive them back to Fort Worth. Ryno bought approximately 10 automobiles from one Bill Jones in Toledo, Ohio, handling the financial arrangements himself. The checks for the cars were issued and paid through Ryno Motor Sales. Ryno's agent Frank Howard was authorized by Ryno to select drivers for these trips, and

to make the necessary arrangements for them. Ryno did not know Kent, and had never met him. Howard selected Kent and several other drivers and made arrangements for Kent to go with the group of drivers to Ohio to drive the cars back to Fort Worth. A fixed fee of $125, covering both the services of the driver and the expenses of making the return trip, including gas and oil, was paid to Kent. Howard presented Kent with a check for $125 drawn on the Ryno Motor Sales bank account. There was no agreement as to repairs, but the drivers would have been reimbursed in case of a major breakdown. Ryno knew that Howard was going to Toledo with the other drivers to get the automobiles. Kent rode to Toledo in the same car with the other drivers. This was his first experience in the business of transporting cars. He had not thus driven cars prior to that time. For him it was a "fill-in" job. All of the cars in transit, including the two in Kent's care, were titled in the name of the leasing corporation from the time they left Toledo until they arrived in Fort Worth, but Ryno regarded them as "his" cars. After they arrived at Fort Worth they were transferred from the leasing corporation to R. D. Ryno Motor Sales. In-transit tags, displayed in the rear windows of the cars, were furnished to the drivers by Howard. Howard told Kent what to do; which cars to take; not to drive the cars fast enough to hurt them, since they were new cars; to take the same route on the return trip to Texas that they had taken on the way to Ohio, and where to deliver the automobiles in Fort Worth. Kent delivered the cars to the proper place in Fort Worth. Ryno testified that he had no "right to fire" the drivers, once the trip had started. No withholding or social security tax was paid on the drivers. An application for a continuance purporting to contain an admission by Ryno that Kent "was the agent, servant and employee of R. D. Ryno at the time and place referred to in plaintiff's petition" was admitted in evidence. It was filed by Harold J. Fisher

for and on behalf of Ryno, and as his attorney.

Appellants contend that the evidence points to only one conclusion, namely, that Kent was an independent contractor. They stress the fact that compensation was paid in a lump sum, out of which Kent was to pay his own expenses and gas and oil for the car; that Ryno had no right to discharge Kent; that Kent was not a regular employee of Ryno, and that the cars were titled in the name of the leasing corporation; that Ryno had no control over the time Kent was to go to work or the time he might stop, "little control over the time used for performance of the complete task for which Mr. C. H. Kent had been employed," and that Ryno gave no instructions "as to where he should gas and oil." The contract was made in Texas. The law of Texas governs the legal effect of the contract. Illinois Fuel Co. v. Mobile & O. R. Co., 319 Mo. 899, 8 S.W.2d 834; Donahoo v. Thompson, Mo.Sup., 291 S.W.2d 70; Kelsall v. Riss & Co., Mo.App., 165 S.W.2d 329. Under the law of Texas a presumption of the existence of the relationship of employer and employee—master and servant—arises when the evidence shows that one person is engaged in the performance of a service for another which service has been expressly authorized by the other. It then devolves upon the party asserting that the relationship is that of independent contractor to show that under the terms of the contract the relationship of master and servant did not exist. Taylor, B. & H. Ry. Co. v. Warner, 88 Tex. 642, 32 S.W. 868; Glazier v. Roberts, Tex.Civ. App., 108 S.W.2d 829; Buckley v. Gulf Refining Co., Tex.Civ.App., 123 S.W.2d 970; Commercial Credit Co. v. Groseclose, Tex.Civ.App., 66 S.W.2d 709; 23 Tex.Jur., Independent Contractors, § 8, p. 550. In the last cited case a finance company authorized the employment of one Morrison to drive an automobile in which it had an interest from Los Angeles, California to Dallas, Texas. Morrison was to receive $30. Out of the $30 Morrison was to pay

all of his expenses, including gas and oil. He was instructed to take the southern route to Dallas, and go by Phoenix, where he was to call on a company representative. He was permitted to carry passengers. Due to a defect in the automobile there was a collision en route. An injured passenger was awarded damages. On appeal the finance company contended that as a matter of law Morrison was an independent contractor. The court rejected this contention, holding that the character of the service to be performed is "antagonistic to the idea that Morrison was an independent contractor." The court held that the issue of independent contractor was a question for the jury and that it was not error to refuse to withdraw it from the jury, saying, 66 S.W.2d loc. cit. 713:

> "One delivering an automobile to a railroad for transportation by rail necessarily surrenders all control over the details of the transportation, but it is not to be presumed that such control is surrendered by one who delivers an automobile which he owns or has a lien upon to one who is to drive it to a distant point and there deliver it to some designated person. It is not a natural inference to assume that the one who is to drive it is at liberty to run at a rate of speed that would injure the car, use insufficient or inferior oil, or otherwise operate the car in such a manner as to injure it. These are details of the work to be done, and the evidence fails to show such surrender of control as would necessarily render Morrison an independent contractor in undertaking to drive the car from Los Angeles to Dallas."

The facts in the Commercial Credit Co. case parallel those in the instant case in that the driver was not a regular employee, was paid a lump sum out of which he had to bear the expenses of transporting the car and was instructed only generally with respect to the route. The instant case is a stronger case on control, for Howard instructed Kent with respect to the speed of operation. The question of legal title to the automobile, stressed by appellants, seems unimportant in determining the question. As the purchaser of the cars, and as the president of the leasing corporation which held title to the cars, and as the person to whom the cars were intended to be (and actually were later) transferred, Ryno had an interest in the transportation of the cars in connection with his automobile business. Ryno in his deposition referred to them as his cars, and at the trial conceded that he had an interest in them. That Ryno had no control over the time Kent was to go to work or the time he might stop, and did not give instructions as to where Kent should buy gas and oil, does not compel a different result. The supreme test in determining the relationship is whether the employer had the right to exercise control over the details of the work, Dillard's, Inc. v. Gentry, Tex.Civ.App., 265 S.W.2d 222, not whether control in fact was exercised. From the fact that Ryno, through his agent Howard, did in fact exercise control with respect to several of the details of the work, the jury could have found that Ryno reserved the right to control. Totally disregarding the effect of the admission of agency, we find substantial evidence from which the jury was authorized to find the existence of agency.

■ The third point for decision is whether the court erred in allowing an amendment of respondent's petition to allege the amount of medical, dental, hospital and nursing bills, and bills for medicines, necessarily incurred and paid by respondent's parents on his behalf; in admitting testimony in support thereof, and in instructing the jury that it could consider such expenses as items of respondent's damages. Appellants contend that upon the occurrence of the injury two causes of action arose: the minor's cause of action for damages for personal injuries and the parents' cause of action for loss of services and for special bills necessarily incurred by the parents in the treatment of the child; that the

parents' cause of action is not assignable and can be no part of the recovery in the minor's suit.

The original petition did not seek recovery of these items. Before trial, however, counsel for respondent informed the court that the parents wanted to waive their right to recover these bills in a separate action and permit them to be recovered in this action, and to be bound by the verdict in this respect. During the trial a formal motion was filed in which respondent recited that his parents had assigned to him and on their own behalf did waive all their rights to recover from appellants any sums they were entitled to recover by reason of the payments made by them for such special services. The parents testified, waiving their rights in the future, by any other action, to recover such bills from appellants or other third parties, and agreeing to be bound by the verdict of this jury as a means of avoiding additional litigation. The court permitted the amendment, admitted evidence in support of these items and instructed the jury with reference to their allowance as proper items of damage. It is basic that an injury to a minor gives rise to two causes of action, as appellants contend; that " 'the damages peculiar to one of these causes of action cannot properly be recovered in an action based on the other in the absence of any waiver or estoppel,' " Evans v. Farmers Elevator Co., 347 Mo. 326, 147 S.W.2d 593, loc. cit. 599, and that a parent is not bound by a judgment in his child's action merely because he acted as next friend, guardian *ad litem*, or guardian, "except where he has permitted the child to recover or litigate the right to damages which would otherwise belong to the parent." Scanlon v. Kansas City, 325 Mo. 125, 28 S.W.2d 84, loc. cit. 88. But where there has been a waiver or estoppel by the parent, the child may recover these items of damage in his own separate action. Such waiver or estoppel occurs when a parent, acting as next friend, guardian *ad litem* or guardian and curator of the minor child, voluntarily and affirmatively waives his rights, or with full knowledge of the contents of the pleadings and in full control of the prosecution of the minor's claims, stands by without objection and permits such a claim to be pressed for the minor and consents that the minor recover items of damage which otherwise belong to the parent. Hufft v. Kuhn, Mo.Sup., 277 S.W.2d 552, loc. cit. 555; Scanlon v. Kansas City, supra; Zongker v. People's Union Mercantile Co., 110 Mo.App. 382, 86 S.W. 486; 37 A.L.R. 11; 67 C.J.S. Parent and Child § 43, p. 747. In this case the father, who was prosecuting the action for his son as guardian and curator, with full understanding and control of the procedure, not only permitted counsel for respondent to file a written motion to amend the petition to incorporate these elements of recovery, but also took the stand and voluntarily, affirmatively and specifically waived his personal right to recover these items, consented that the minor recover them, and agreed to be bound by the verdict and judgment. The mother took the stand and did the same thing. This constituted an effective waiver and estoppel. This point is ruled against appellants.

Appellants next charge error in Instruction No. 1, which follows:

"The court instructs the jury that the law of this state requires a driver of an automobile to exercise the 'highest degree of care.' By the term 'highest degree of care,' as used in these instructions, is meant such care as would be exercised by a very careful and prudent driver under the same or similar circumstances. Any failure to use such highest degree of care in the operation of a motor vehicle is negligence.

*"The court further instructs the jury that the law of this state places a duty upon the driver of an automobile, when approaching the entrance to a through highway, to stop, and thereafter to look carefully ahead and laterally, and to yield the right of way to other automobiles which have entered*

*the intersection on the through highway or which are approaching so closely on the through highway as to constitute an immediate hazard.*

"The court further instructs the jury that under the law of this state the owner of two automobiles operated as a tow-bar unit over the highways of Missouri is liable for the injuries to one riding as a guest in another vehicle if said guest is exercising ordinary care for his own safety and if his injuries are the direct result of the negligent operation of said tow-bar unit by a driver who is on an errand·for or in the business of the owner of said tow-bar unit.

"Therefore, the court instructs the jury that if you find and believe from all the evidence that on January 18, 1955, the plaintiff was riding as a passenger in an automobile being driven in a westerly direction on Missouri State Highway Route U. S. No. 66 and was at all times mentioned in the evidence exercising ordinary care for his own safety, and if you find that the tow-bar unit described in evidence belonged to the defendant R. D. Ryno, doing business as R. D. Ryno Motor Sales, and that the defendant C. H. Kent was then on said January 18, 1955, engaged in the operation of said tow-bar unit on an errand for or in the business of the defendant R. D. Ryno, doing business as R. D. Ryno Motor Sales, and was then driving said tow-bar unit in a southerly direction over Webster County Road 'W' and that said Webster County Road 'W' intersected said State Highway 66, and if you find that there was a stop sign erected at said intersection warning drivers approaching said Highway 66 from the north to come to a stop before proceeding on to said Highway 66, and if you find said Highway 66 was a through highway and that the said defendant C. H. Kent failed to stop said tow-bar unit but drove the same out onto the traveled portion of said Highway 66 without stopping at a time when the automobile in which plaintiff was riding was approaching so closely on Highway 66 as to constitute an immediate hazard, if you find it was, and if you further find that the said defendant C. H. Kent failed to yield the right of way to the automobile in which the plaintiff was riding, and also failed to keep and maintain a careful and vigilant lookout ahead and laterally for other vehicles upon said Highway 66, including the vehicle in which plaintiff was riding, and if you find that such failure, if any, on the part of the defendant C. H. Kent was negligence, as defined in these instructions, and that such negligence, if any, directly and proximately caused the automobile in which plaintiff was riding to collide with the tractor trailer truck mentioned in the evidence, and that the plaintiff was injured and damaged thereby, then your verdict shall be in favor of the plaintiff, Jerry Lee Garrison, and against both defendants, C. H. Kent and R. D. Ryno, doing business as R. D. Ryno Motor Sales." (Italics ours.)

Appellants argue that the italicized portion of the instruction imposed an absolute and unqualified duty on Kent, as a matter of law, to stop, regardless of any other facts and circumstances; that this is not the law; that the duty imposed by Section 304.021, subd. 4 RSMo 1949, V.A.M.S., is a relative duty dependent upon the facts and circumstances of the particular case and that the instruction should have submitted to the jury the question whether it was negligence to drive into the intersection without stopping. This is a challenging criticism " * * * because traffic regulations imposed by statute are not unyielding and inflexible. 60 C.J.S. Motor Vehicles § 271. They are not to be applied rigidly, absolutely and peremptorily without regard to the circumstances or conditions. Wines v. Goodyear Tire & Rubber Co., supra. (Mo.App., 246 S.W.2d 525). The

duties imposed by the statutory rules of the road may be qualified by the circumstances. Nelms v. Bright, Mo.Sup., 299 S.W.2d 483." MacArthur v. Gendron, Mo.App., 312 S.W. 2d 146, loc. cit. 150. Instruction No. 1, however, is not vulnerable to this criticism. The italicized paragraph, considered separately, does not unqualifiedly instruct the jury to bring in a verdict for respondent if Kent failed to stop, failed to look carefully ahead and laterally, and failed to yield the right of way to approaching vehicles. Certainly if we read the instruction as a whole rather than by isolated parts, Banks v. Koogler, Mo.Sup., 291 S.W.2d 883, loc. cit. 890, we find in it no imposition of an absolute and unqualified duty to stop under any and all circumstances. . The duties to be performed under Section 304.021, subd. 4 RSMo 1949, V.A.M.S., are carefully confined and limited to a particular hypothesized situation related to the surrounding facts and circumstances, namely, driving onto the traveled portion of the through highway without stopping *at a. time when the automobile in which respondent was riding was approaching so closely on the through highway as to constitute an immediate hazard.* This saving clause, to be found both in the criticized second paragraph (which accurately states the law on the subject), and in the verdict-directing fourth paragraph (where the law is tied in with the facts), neutralizes appellants' criticism of the instruction. Because of the "so closely" clause respondent's right to a favorable verdict is predicated upon a jury finding of facts which constitute negligence. By the "so closely" clause the jury is obliged to find the issue of negligence *vel non* according to the statutory definition, upon a consideration of a certain hypothesized set of surrounding facts and circumstances, and is not directed to return a verdict for respondent automatically upon a mere finding of failure to look, stop or yield.

▇▇▇▇ Appellant Ryno's fifth point relates to the action of the court in permitting the introduction in evidence, as an admis-

sion by appellant Ryno against his interest, of an application and affidavit for a continuance filed in his behalf. Error is claimed in the admission of the evidence, and in refusing Ryno's offer to show the entire facts and circumstances surrounding the filing of the application and affidavit. Here is the background: When the case was first set for trial Kent, Ryno's principal witness, was not able to appear at the trial. On January 18, 1957 counsel for Ryno's insurance carrier, representing Ryno, filed an application for a continuance for Ryno alleging that "The defendant C. H. Kent, who, as admitted by defendant R. D. Ryno, was the agent, servant and employee of R. D. Ryno at the time and place referred to in plaintiff's petition, is unable to appear * * *," and in support thereof filed an affidavit, sworn to by counsel, that he was attorney for Ryno and was authorized to file the application for and on behalf of Ryno and that the averments of the application were true. When the case was tried Ryno denied that Kent was acting as his agent, servant and employee. In an effort to establish agency respondent's counsel offered the application and affidavit for a continuance as an admission against interest. The admission of this evidence is objected to on this appeal on the ground that Ryno had not authorized the attorney to make this application and that an attorney cannot bind his client by any unauthorized act by which the substantial rights of his client are surrendered. No such objection was made at the trial. The objection at the trial was that the evidence was "immaterial to any issue in this case" and "not binding" on Ryno. It was a general objection, insufficient to raise the point now urged. Collins v. Leahy, Mo. App., 102 S.W.2d 801; Mick v. John R. Thompson Co., Mo.App., 77 S.W.2d 470. The general objection could have been sufficient only if the evidence was inadmissible for any purpose. State ex rel. State Highway Commission v. Rauscher Chevrolet Co., Mo.Sup., 291 S.W.2d 89, 55 A.L.R. 2d 773. But it *was* admissible for the pur-

pose offered, namely, as an admission against interest to establish the agency of Kent for Ryno, so the court was justified, on the ground of generality, in overruling the objection.

Ryno's counsel then informed the court that Ryno had "a right to show" that in January, 1957 the attorneys who were then acting for him had not been employed by him, but had been hired by his insurance company; that the insurance company later "went broke", and that Ryno had hired these same attorneys as his personal attorneys six months *subsequent* to the filing of papers in which the admission against interest was made. The court ruled that Ryno could show that the attorneys were employed by Ryno to represent him personally after the date of the application and affidavit, but could not show that the attorneys were originally employed by an insurance company or that the insurance company later "went broke." On this appeal it is urged that the ruling improperly limited the offer of proof and prevented Ryno from showing "the full facts and circumstances surrounding the filing of this application and affidavit"; that respondent opened up the subject by introducing the application and affidavit, and that Ryno therefore was entitled to bring out the entire factual background even though in so doing some otherwise inadmissible evidence might be brought into the case. Whether the ruling was proper or improper, it had little effect upon Ryno. Whether through misunderstanding on his part or by design, Ryno proceeded in direct violation of the court's ruling to testify to the very things the court had ruled inadmissible. Ryno testified that neither on January 18, 1957 nor at any time prior thereto had he personally hired the lawyers who filed the application and affidavit for a continuance; that as of January 18 Ryno knew that his defense was to be "handled by some one"; that if the lawyers were in the case on January 18 it was *in behalf of an insurance company*; that Ryno's contact with the lawyers previous to that date resulted from his receipt of a letter concerning the suit *"through the I. C. T. Insurance Company that went broke later"*; that Ryno was later advised that the lawyers were no longer representing him and that he would have to hire an attorney if he was to be defended in the case; that he did not hire these lawyers for his own representation until June 27, 1957. The initial refusal of the court to permit Ryno to go into the full background of the facts and circumstances surrounding the employment of the lawyers and the filing of the application and affidavit for a continuance, therefore, was effectively circumvented by Ryno, who testified to every fact and circumstance which he now says he should have been permitted to show. Although technically the court had ruled against his contention, the practical effect of what transpired was that Ryno had made the point he was seeking to establish, namely, that it was the attorneys for an insurance company which later went broke who made the damaging admission of agency, and not Ryno, or attorneys personally employed by Ryno. Up to that point in the proceedings Ryno could not have been prejudiced. The court ruling was so thoroughly thwarted that counsel for *respondent* finally moved for a mistrial on the ground that Ryno, over his protest and repeated objections, had been permitted to go into the question of whether there was insurance in the case and whether an insurance company had gone broke, and that Ryno had deliberately injected that fact in the case, time after time. The court was about to declare a mistrial when it was agreed, in proceedings outside the hearing of the jury, that respondent would withdraw his motion for a mistrial and that the court would instruct the jury to disregard any statements "about any insurance company." The court then instructed the jury that the question whether there was insurance involved was not for the consideration or knowledge of the jury; that "any and all statements by either side, or by counsel, or anyone else * * * about any insurance company, in

any way, should be totally disregarded by the jury * * *." But it is not the action of the court in orally directing the jury to disregard the references and statements relating to the subject of insurance of which complaint is made. No such point was made at the trial, Ryno's counsel having made no objection to the giving of the oral instruction, either before or after it was given. Nor has the point been raised on this appeal. Instead, it is the court's earlier refusal of Ryno's offer "to show the entire facts and circumstances surrounding the filing of the application and affidavit" of which complaint is here made. As indicated, there is no foundation for this complaint, because every fact and circumstance which Ryno now says he should have been permitted to show was actually shown by him at the trial. The point actually preserved, therefore, is without any merit. The other point was not preserved, and therefore has been waived. There is no prejudice to appellant Ryno under the record made in this case.

 Appellants' sixth point is that a mistrial should have been declared because the policy of liability insurance issued to Ryno was left on respondent's counsel table in close proximity to the jury box and clearly visible to the jury. Appellants state in their brief that "during the voir dire and as the jury filed from the jury box within two or three feet of the counsel table, it was observed that this policy of insurance was lying face up on the plaintiff's counsel table, in clear view of the jurors," but this is not supported by any evidence or admission in the record. Respondent's counsel did concede that the policies (photostats) were "on top of other parts" of their file for a time, but nothing in the record confirms the charge that they were in view as the jury filed from the box within two or three feet of the counsel table, or that any juror saw the photostats or recognized them as insurance policies. The trial judge carefully considered the incident and made the following observation: "I have seen the photostats; I don't see

how they could see them from the jury box. They are difficult to read, when they are close up, even; motion will be overruled." This was a matter within the sound judicial discretion of the trial judge. We find no abuse of discretion in the action taken.

 Next, appellants complain of the failure to declare a mistrial because a clipping from a local newspaper covering its report of this lawsuit was found in the jury room after the jury had returned its verdict. Appellants' brief contains a quotation of the alleged contents of the clipping, but this appears nowhere in the record. There was no admission or proof that the quotation and the clipping were identical, or how, when, or by whom any such clipping was taken into the jury room, or that the quotation was misleading or incorrect, or that it was read by any member of the jury, or that it influenced the jury or affected the outcome of the lawsuit in any respect, or that appellants were prejudiced thereby. In two cases cited by respondents, Copeland v. Wabash R. Co., 175 Mo. 650, 75 S.W. 106, and Shafer v. Kansas City Rys. Co., Mo.App., 201 S.W. 611, newspaper articles concerning a trial were actually read by jurors. There was no showing, however, that the reading of the articles influenced the jurors, and the failure of the trial court to discharge the jury was upheld. By the greater reason the action of the trial judge should be upheld in the instant case, where the jurors are not shown to have read the article.

 Finally, appellants urge that error was committed by not discharging the jury when it was pointed out to the trial court that during the closing argument of respondent's counsel respondent's mother was seated in the front row in clear view and within audible range of the jury, openly weeping. While demonstrations of this kind are improper and are to be avoided, their prejudicial effect is within the trial court's sound judicial discretion. Boese v. Love, Mo.Sup., 300 S.W.2d 453, and cases

cited, loc. cit. 460. The trial court carefully considered the matter. In overruling the motion to discharge the court noted that the attorney had been talking five minutes; that the lady was not making any sound, and that as soon as the matter was called to the court's attention she was removed from the courtroom. We are unable to say that the court abused its discretion in overruling the motion to discharge.

The judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.