David R. WARTENBE, Loretta C. Wartenbe, John A. Wartenbe and Cledith D. DeNoon, Trustees of Wartenbe Filters, Inc., Plaintiffs-Appellants,

v.

CAR–ANTH MANUFACTURING AND SUPPLY COMPANY, Defendant-Respondent.

No. 31228.

St. Louis Court of Appeals.

Missouri.

Nov. 20, 1962.

Wilder Lucas, Jack R. Mandel, St. Louis, for plaintiffs-appellants.

Hocker, Goodwin & MacGreevy, John M. Goodwin, St. Louis, for defendant-respondent.

DOERNER, Commissioner.

Plaintiffs' suit is one for alleged breach of contract, in which they prayed for a judgment of $15,444. Defendant denied generally and counterclaimed for $1632.97 for work performed. Trial before a jury resulted in a verdict and judgment in favor of defendant on plaintiffs' cause of action and in favor of plaintiffs on defendant's counterclaim. Plaintiffs thereupon appealed to the Supreme Court, where the matter was briefed and argued. In their brief plaintiffs had asserted that the amount in controversy exceeded $15,000, but upon reviewing the record the Supreme Court found that plaintiffs had submitted the case to the jury upon an expressed request for a verdict of $9,122.82. It thereupon determined that it lacked jurisdiction and transferred the appeal here.

Since the merits of the controversy are not involved in the points raised on appeal a brief statement of the factual background will suffice. On or about October 1, 1953, Wartenbe Filters, Inc. was awarded a contract to furnish 961 oil filters to F. H. Magraw and Company. Wartenbe Filters did no manufacturing, and arranged to obtain the component parts of the oil filters from various suppliers, including top cover castings made of aluminum, and plug castings made of bronze, from Bodine Foundry. About October 2, 1953, it obtained a written bid from the defendant to machine these castings in a certain manner. On October 23, 1953 Wartenbe Filters gave defendant a purchase order for the work, which defendant accepted. Under the contract thus made defendant agreed to machine 975 aluminum top cover castings for the price of $149.12 per hundred, and 975 bronze plug castings for the price of $62.50 per hundred. We gather from the testimony that the work included the machining of a recess in the cover casting into which the plug was to be seated, and the purchase order contained the provision: "Valve cylinder in cover and valve plug to be lapped for leak proof fit. Each cover with plug lapped in to be kept together by washer and nut furnished. * * *"

Plaintiffs' evidence was that after defendant had completed its work on a few of the covers and plugs they were tested by Wartenbe Filters with water under pressure and found to leak. Defendant's further efforts to lap in the plugs so as to obtain a leak-proof fit were unsuccessful, and, according to plaintiffs' evidence, defendant told Wartenbe Filters to take the work elsewhere. Wartenbe Filters attempted to find another supplier who would do the work, and one of three firms which subsequently tried to obtain a leak-proof fit, the Small Manufacturing Company, finally devised a method which achieved that result on two or three assemblies. However, plaintiffs' evidence was further to the effect that a sufficient volume of production to meet Wartenbe Filters' deadline could

not be realized by this method and that it eventually substituted a top cover casting made of cast iron for that of aluminum.

This action was filed by Wartenbe Filters, Inc., on November 21, 1955. At that time it was a Missouri corporation, in good standing, and it remained so until January 1, 1958, when the Secretary of State forfeited its charter for failure to register and file the anti-trust affidavit as required by Chapter 351 RSMo 1959, V.A.M.S. Plaintiffs, as the then directors and officers in office, who became trustees of the corporation by virtue of Section 351.525, were thereupon substituted as plaintiffs.

Defendant tacitly admitted that it had not performed the contract, and the basis of its defense was impossibility of performance. According to its evidence, a leak-proof fit could not be obtained or retained between the bronze plug and the aluminum casting because the plug, being made of the harder metal, galled and scored the softer aluminum casting. Plaintiffs denied the claimed impossibility of performance, and pointed to one leak-proof assembly achieved by David Wartenbe, one of the plaintiffs and the former president of Wartenbe Filters, Inc., and to the two or three made by Small Manufacturing Company. Thus the decisive issue of fact was a relatively simple one.

We are not asked to pass upon the merits of the defense asserted below. Plaintiffs' primary complaint on appeal is that they were deprived of a fair trial. They contend that this resulted, first, because the court permitted defendant to cross-examine Wartenbe about certain partially paid bills; and second, because of various prejudicial comments, remarks and arguments made by counsel for defendant. Their only other point is that Instruction No. 2, given at the request of defendant, was prejudicially erroneous.

As to the first part of plaintiffs' primary complaint, on direct examination plaintiffs' witness David Wartenbe enumerated various expenses for merchandise and labor which plaintiffs claimed were incurred because of defendant's breach of contract. On cross-examination defendant developed, without objection, that there were some accounts for merchandise that had not been paid in full. Defendant then inquired what had happened to the machinery and other physical assets of Wartenbe Filters, plaintiffs objected, and a long and involved colloquy occurred out of the hearing of the jury. This ended with defendant's claim that it was entitled to know whether the bills had been paid (although that subject had nothing to do with the question propounded), and the court commented, "Yes. He may answer." Defendant then questioned Wartenbe further about various bills, and developed that certain other accounts had been only partially paid.

■ We have painstakenly searched the record and have failed to find any objection by plaintiffs to defendant's line of inquiry, which of itself would bar plaintiffs' complaint on appeal. Furthermore, plaintiffs cite no authority holding that such cross-examination was improper, nor have we found any. Of course, if such debts were incurred and were properly attributable to defendant's breach of contract, then plaintiffs were entitled to recover for them whether or not they had paid them. Curtis v. McNair, 173 Mo. 270, 73 S.W. 167; Orf v. Ostmann, Mo.App., 170 S.W.2d 941; Patterson v. Springfield Traction Co., 178 Mo.App. 250, 163 S.W. 955. At plaintiffs' request, the court instructed the jury to that effect. We find no merit in plaintiffs' contention.

A proper consideration of the second part of plaintiffs' complaint requires a further statement of facts. In their petition plaintiffs alleged that Wartenbe Filters had agreed to furnish the oil filters to the Magraw Company for $31,059.52; that its actual cost was $32,434.24; that its cost would have been only $18,489.84 had defendant performed its contract; and that Wartenbe Filters had therefore suffered damages in the sum of $13,944.40. When plaintiffs sought to prove their damages by

showing these over-all figures defendant repeatedly objected that the proper measure of damages was the additional costs, if any, incurred by Wartenbe Filters in having others do the work on the two parts which defendant had contracted to do, and not the over-all costs of obtaining and assembling the various other parts which went to make up the filter. After a conference in chambers on the subject, plaintiffs seemingly agreed with defendant's contention and thereafter developed from witness Wartenbe their evidence on damages in accordance with that theory.

However, when defendant cross-examined Wartenbe it returned to the over-all figures and obtained from him the admission that the claimed total cost of $32,434.24 included the cost of replacing certain patterns which had been destroyed in a fire at the shop of another supplier; and that it also included the defendant's unpaid bill of $1,132.97 for work performed, for which defendant was counterclaiming. Defendant also brought out that plaintiffs' claimed out-of-pocket loss was the difference between $31,059.52, received from Magraw, and its over-all cost of $32,434.24, or about $1,374. The record then reveals the following:

"Q. (by Mr. Goodwin): All right. When you take off all of these things, when you take off our bill, which you haven't paid; when you take off Bodine's $2,000.00, which you haven't paid; when you take off $1,100.00 for a pattern that burned up; and when you take off $230.00 for materials furnished and some other things, you actually had a profit on this, didn't you?

"MR. LUCAS: I object to this, Your Honor, because he incurred those liabilities and he has already stated he hasn't paid them—

"MR. GOODWIN: It goes to the credibility of the witness that he would claim things which he is not entitled to.

"MR. LUCAS: No. The question is, the man is entitled to claim what he has incurred as an obligation. In other words, the corporation has obligated itself in certain regards. To the extent that they have, that is an element of damage. There is the question of whether they have been able to pay for it or not, but they are liable for it.

"MR. GOODWIN: Now, that is not true. They are no longer liable for them, because the corporation ceased to exist and the man is not personally liable for them.

"MR. LUCAS: He is a trustee and he is bringing this lawsuit as a trustee.

"MR. GOODWIN: He is bringing the lawsuit to pay these suppliers? They have all charged it off long years ago.

"MR. LUCAS: I don't know whether they have charged it off or not. Apparently not.

"MR. GOODWIN: There is no lawful way they can recover against him now. The corporation ceased to exist more than a year ago and Mr. Lucas knows it.

"MR. LUCAS: Now, Your Honor, please, he can be sued and his obligation as trustee is to collect and that is one reason it is being brought here, so that he does get the money with which to meet his obligations. These are obligations incurred, it is not to be taken into consideration on profit and he knows that just as well as I do.

"MR. GOODWIN: All right. Well, we'll get to his motives as to whether out of any moral compunction he is going to pay them."

■ Thus during this verbal exchange, which occurred in the presence and hearing of the jury, defendant's counsel intimated that plaintiff trustees had made a profit; declared that plaintiff trustees were no longer liable for the corporation's debts more than a year before the date of trial; stated that there was no lawful way in which the

creditors could recover against the plaintiff trustees because of the passage of over a year; and asserted as a fact that the creditors had charged off such debts long years ago. Of course, the matter of whether Wartenbe Filters or plaintiff trustees had made a profit on its contract with the Magraw Company was foreign to any issue in the case. Furthermore, counsel's statements of the law relating to the obligations of a corporation whose charter has been forfeited, and the rights of its creditors, was incorrect. While the forfeiture of its charter effects its dissolution, such dissolution does not, as it did at common law, extinguish the corporation's debts. Bruun v. Katz Drug Co., 351 Mo. 731, 173 S.W.2d 906; Diekroeger v. Jones, 235 Mo.App. 1117, 151 S.W.2d 691. Section 351.525 RSMo 1959, V.A.M.S., specifically provides that the directors and officers become trustees for the purpose of winding up its affairs, including the duty to "* * * pay its debts and obligations * * *." The same statute further provides that the trustees may be sued, and if Section 351.565 does not establish a period of two years within which creditors may sue a corporation whose charter has been forfeited by the Secretary of State, then it would appear that the general statutes of limitation govern such actions. See Bruun v. Katz Drug Co., 359 Mo. 334, 221 S.W.2d 717. In any case, creditors are not limited to one year, as intimated by counsel. As to counsel's assertion that all of the creditors had charged off the debts long years ago, there was not a shred of evidence in the record to justify the statement.

The foregoing colloquy was initiated, it will be recalled, when defendant asked Wartenbe whether "You actually had a profit." Without waiting for a ruling on the objection to that question, defendant then asked Wartenbe:

"Q. (by Mr. Goodwin, continuing): Isn't it a fact that you and your wife held notes executed by Wartenbe Filter Company in 1946, '45, '44, is that right?

"MR. LUCAS: Just a minute, Your Honor, that can have absolutely nothing to do—

"MR. GOODWIN: I want to show he milked the corporation dry and he wouldn't pay any one of these guys if he had the money.

"MR. LUCAS: Now, I at this moment move the jury be discharged.

"THE COURT: You may disregard that.

"MR. LUCAS: Not only that. That they be discharged at this point, because that is done only for one purpose and Your Honor knows it and so does counsel.

"MR. GOODWIN: I want to show his motive.

"MR. LUCAS: That is not a proper showing and you know it.

"MR. GOODWIN: I want to show his motive. That his motive is not to recover for the suppliers, but to recover for himself. I want to show he could have paid his suppliers if he hasn't foreclosed on his own machinery and taken it away as an asset of the corporation and I am entitled to show it, because this man is coming in here purportedly as a trustee to recover for the creditors when, in effect, as the president and a stockholder he stood by and watched his wife foreclose and bid in his own machinery.

"MR. LUCAS: Your Honor, please. I move the jury be discharged because of prejudicial remarks of counsel. Complete misconduct on the part of counsel for the defendant."

At that point the court admonished the jury and adjourned until the following morning. The record discloses that the next morning the following further proceedings were had in chambers:

"THE COURT: Let the record show that after a discussion in chambers aft-

er the adjournment last night and also this morning, for the record, the Court will overrule the objection and deny the motion of counsel for the plaintiff.

"MR. GOODWIN: For the purpose of the record, I offer to prove that this man caused a mortgage to be given to his wife for less than what was adequate, taking all the assets of the company, which led to its ultimate foreclosure and she bid it in, either by her as his wife or in his behalf at foreclosure. I offer to prove this, but if it is objected to I will not go into it further, but I want to protect my record.

"MR. LUCAS: I am going to object because I am going to preserve my record very carefully. I object to it and it is introduced solely for the purpose of prejudicing the jury and is not a subject of proper examination under the record in this case.

"THE COURT: I will overrule your objection."

We must confess our unfamiliarity with the trial procedure by which the examining party, after an objection to his question has been *overruled,* is permitted to make an offer of proof in lieu of requiring the witness to answer—whether to protect his record or for any other reason. In the instant case defendant's offer of proof came to naught, for when plaintiffs objected thereto the court *again* overruled their objection. But despite the fact that the court had thus twice overruled plaintiffs' objections to defendant's line of inquiry, and by its rulings had granted defendant permission to prove what it had stated it wanted to prove, when the trial was immediately thereafter resumed defendant did not make the slightest attempt to do so.

There can be no reasonable doubt that by the charges it made defendant seriously impugned and reflected upon the character and integrity of David Wartenbe. He was not only one of the plaintiff trustees but was also their principal witness, and plaintiffs' entire case depended upon the acceptance of his testimony by the jury. Defendant's grave charges could have had no other effect on the jury than to discredit Wartenbe in their eyes. And that adverse effect was undoubtedly compounded by the impression which was left with the jury. It heard defendant's assertions as to what it proposed to prove regarding Wartenbe's alleged nefarious actions, and heard plaintiffs' objections. But it did not hear the court's ruling that defendant could proceed to prove its charges, because the ruling was made in chambers, nor was it advised thereof. When, therefore, the trial was resumed and defendant failed to pursue the matter the jury could only conclude that the plaintiffs' objection had been sustained. Thus the jury was left with the impression that defendant could have substantiated its charges had it been allowed to proceed, but had been prevented from doing so by an adverse ruling of the court.

Defendant seeks to justify its action respecting these various comments on the grounds that it was entitled to bring out the excessiveness of plaintiffs' claim for damages, particularly items which were clearly unrelated to defendant's breach of contract, such as the patterns destroyed by fire at another. The record shows that defendant was freely allowed to do so, but as is evident from the passages quoted, the questions propounded and the comments made did not relate to that issue. Nor, in the light of the record, can we accept the argument that the comments were retaliatory and made in the heat of the trial. It was defendant, not plaintiffs, who injected into the case the issues of creditor's rights against the dissolved corporation and the disposal of its assets. Shortly prior to the foregoing the court had sustained plaintiffs' objection to defendant's question to Wartenbe: "And you know of course that since the corporation has been out of existence more than a year there isn't any way they (the creditors) could collect on it?" Likewise, defendant had earlier asked War-

tenbe: "What happened to all the jigs and dies and machinery and everything of the Wartenbe Filter Company," to which plaintiffs objected. As heretofore stated, the question and objection precipitated a colloquy which ended with the court ruling that defendant could inquire as to whether or not the bills of creditors had been paid.

■ As a matter of fact, counsel returned to this issue of the rights of creditors in his closing argument:

"You and I both know where the fault lies. You and I also know this. He still owes this outfit $1132.97. Now, his corporation is no more, defunct, it is gone—

"MR. LUCAS: Now, just a moment. That has no bearing.

"MR. GOODWIN: Well, we never got our money.

"MR. LUCAS: Now, just a minute. That is not a proper argument as to whether they ever got their money if they were entitled to it. The question of being defunct has nothing to do with it.

"MR. GOODWIN: If your Honor, please, I let him have his.

"MR. LUCAS: Improper argument.

"THE COURT: He may draw inferences. Go ahead.

"MR. GOODWIN: This corporation doesn't exist any more. This last board of directors brings a suit and they are not responsible for the debts and they can't be made to pay for it.

"MR. LUCAS: Now, that is not—

"MR. GOODWIN: Well, that is the law.

"MR. LUCAS: The last board of directors can be made to pay for it if they have any assets.

"MR. GOODWIN: Well, they don't hold any assets.

"MR. LUCAS: Well, there is no showing of that.

"THE COURT: Go ahead.

"MR. GOODWIN: We stand about as much chance of ever collecting that as Mr. Wartenbe ever did of getting his job done in aluminum.

"MR. LUCAS: I object to this argument, Your Honor.

"THE COURT: Well, he may draw inferences. Go ahead."

What we have previously said regarding the right of creditors to sue the directors and officers as statutory trustees is equally applicable here. The statement that the plaintiff trustees "don't hold any assets" was unsubstantiated by any evidence in the record. Of course, counsel should neither argue nor draw inferences from matters not in evidence. Faught v. Washam, Mo., 329 S.W.2d 588. And the comment of the court that defendant might draw inferences, and its action in directing the defendant to "Go ahead" without ruling on plaintiffs' objection, was tantamount to overruling the objection and stamping the conduct of defendant's counsel as proper. Dunn v. Terminal Railroad Association of St. Louis, Mo., 285 S.W.2d 701; Ryan v. Sheffield Car & Equipment Co., Mo.App., 24 S.W.2d 166.

■ This case amply illustrates the wisdom of the principle announced in Dunn v. Terminal Railroad Association of St. Louis, Mo., 285 S.W.2d 701, 708, 709, that "Lengthy colloquy between the attorneys and the trial court within the hearing of the jury is not commendable for the reason that during such colloquy comments are likely to be made which have an improper influence on the minds of the jurors. * *" Plaintiffs vigorously contend that the foregoing comments and argument of counsel were prejudicial, and cite numerous cases in which our appellate courts have condemned as prejudicial a wide variety of remarks and arguments of counsel. De-

fendant with equal fervor argues that the comments or arguments adjudged to be prejudicial in those cases are not analogous to those presently under consideration; and, in addition, it leans heavily on the familiar rule that the trial court is allowed wide discretion in ruling on the propriety and prejudicial effect of conduct, comments and argument of counsel, and that its rulings will generally be deferred to on appeal unless an abuse of discretion is shown. Hancock v. Kansas City Terminal Ry. Co., 347 Mo. 166, 146 S.W.2d 627; Eickmann v. St. Louis Public Service Co., Mo., 323 S.W.2d 802; Garrison v. Ryno, Mo., 328 S.W.2d 557. "* * * But, the doctrine of due deference to the trial court in discretionary matters is not to be self-administered by appellate courts to anesthetize against sensitivity to prejudicial error or employed by counsel to neutralize all such error * * *." Faught v. Washam, Mo., 329 S.W.2d 588, 600.

In the final analysis, whether or not the particular comments or arguments are so prejudicial as to constitute reversible error depends upon the nature of the utterances and the circumstances under which they were made. Dunn v. Terminal Railroad Association of St. Louis, supra; McNeill v. Fidelity & Casualty Co. of New York, 336 Mo. 1142, 82 S.W.2d 582. When we take into account the improper and derogatory issues which were injected into the case, counsel's mistaken statements as to the law, the unsubstantiated and prejudicial reflections upon the character and integrity of the witness, and the court's ruling (or lack thereof) on defendant's argument, we cannot avoid the conclusion that plaintiffs were denied that fair and impartial trial which is the inherent right of every litigant.

Our conclusion that this case must be reversed and remanded makes it unnecessary to pass upon plaintiffs' complaint regarding Instruction No. 2. Upon a retrial defendant will have the opportunity to redraft it, if it so desires, to meet the criticism leveled at it by plaintiffs.

For the reasons stated the Commissioner recommends that the judgment be reversed and that the cause be remanded for a new trial.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court. Accordingly, judgment is reversed and the cause remanded for a new trial.

RUDDY, Acting P. J., and FRANK W. HAYES and RAY E. WATSON, Special Judges, concur.