**Mary E. GAGE and Daniel W. Gage, Plaintiffs–Respondents,**

. v.

**John MORSE, M.D., Defendant–Appellant.**

**No. 20342.**

Missouri Court of Appeals, Southern District, Division Two.

Sept. 26, 1996.

Motion for Rehearing or Transfer Denied Oct. 21, 1996.

Application to Transfer Denied Nov. 19, 1996.

John L. Oliver, Jr., Oliver, Oliver & Waltz, P.C., Cape Girardeau, for defendant-appellant.

John L. Cook, Thomasson, Gilbert, Cook, Remley & Maguire, L.C., Cape Girardeau, for plaintiffs-respondents.

SHRUM, Judge.

John Morse, M.D. (Defendant) appeals from a judgment adverse to him in a medical negligence case.[1] Defendant's principal contention is that Plaintiff's evidence was insufficient to prove the causation element of her case (Point I). In related claims (Points II and V), Defendant charges that the trial court committed reversible error in admitting irrelevant damage evidence and allowing closing argument thereon. Additionally, Defendant claims that the trial court committed reversible error when it refused to dismiss Plaintiff's alternative breach of warranty count and allowed the presentation of evidence thereon (Point III). Finally, Defendant complains that he was prejudiced by the submission to the jury of a physician's video tape deposition without deleting the verbal exchanges and comments between counsel as the deposition was being taken (Point IV).

Finding no reversible error as averred, we affirm.

## BACKGROUND FACTS

On November 15, 1991, Plaintiff fell at her home and fractured her left knee. The ultimate diagnosis was that Plaintiff had suffered a comminuted medial tibial plateau fracture. The superior articular surface of the tibia is part of the knee joint. In this case, Plaintiff's medial plateau, which provides 70 percent of the articular surface, was fractured into many pieces. Cartilage in Plaintiff's knee was damaged and it was removed in her initial surgery. However, no damage to cruciate ligaments was noted during this first surgery. Likewise, no tear, deformity, or detachment of Plaintiff's medial collateral ligament was observed at that time.

When taken to a hospital, Plaintiff hired Defendant, an orthopedic physician, to treat her. Defendant opted to repair Plaintiff's knee by internal fixation, a procedure to mobilize the fracture "inside ... under the skin." As he proceeded, Defendant determined that part of the fragmented medial tibial plateau was "compressed down[,]" approximately "half an inch to an inch." Upon elevating the plateau, he found "a large defect there [from bone damage,]" such that a "hole would still be there if you just put it in a cast[.]" Defendant testified that he knew of Plaintiff's medical history and conditions, which included a fractured left patella in 1980, osteoarthritis in her left knee, osteoporosis, and peripheral vascular disease. Possessed with that knowledge and also his observations of the quality of Plaintiff's bone, Defendant chose to use bone cement and screws as internal fixation rather than a bone graft and buttress plate method of internal fixation. As to his decision not to use the latter procedure, Defendant testified that he was "concerned about the ability of the bone to regenerate[,]" that he did not feel that the buttress plate would give additional support,

---

1. In this opinion, we use the term Plaintiff to refer to Mary E. Gage. The jury awarded Plaintiff damages but denied the claim of Daniel W. Gage (Husband) for loss of consortium. Husband does not appeal from the judgment adverse to him.

and that "in this particular situation, as soon as the knee started moving, the bone graft would simply collapse on itself."

By January 2, 1992, approximately 45 days after her initial surgery, Defendant noted some medial laxity in Plaintiff's knee, meaning that it was unstable. The instability worsened until on February 5, 1992, Defendant did a total knee reconstruction for Plaintiff. Although Defendant would have preferred to have used a resurfacing prosthesis for Plaintiff, he was unable to do so because of her bone loss and ligament laxity. Instead, he used an offset hinge as Plaintiff's knee joint replacement. He characterized the offset hinge as a "salvage prosthesis" which would eventually loosen. Almost immediately, Plaintiff's knee became infected. After Defendant's efforts to treat Plaintiff's infection were unsuccessful, she employed another physician, Dr. James L. Guyton, an orthopedic specialist in Memphis, Tennessee.

A summary of Dr. Guyton's testimony follows. When he first saw Plaintiff on May 22, 1992, "[s]he had an infected hinge knee replacement" and the hinge was loose. The hinge prosthesis has a higher rate of infection than the resurfacing type and Plaintiff's infection was contributed to by the fact that the hinge device was used. Dr. Guyton removed her knee prosthesis and commenced treating her infection. Later, he did a knee replacement for Plaintiff in which he used a custom "total condylar 3" prosthesis. He estimated its life expectancy as: "somewhere around five [years]—I think it will fail before ten years." Dr. Guyton also would have preferred to use a "resurfacing" prosthesis. He based his opinion that it is a superior prosthetic on its longer life expectancy and lower infection risk. Statistically, 94 percent of the "resurfacing" type prostheses are still good after ten years. However, once Defendant used cement rather than bone grafting in his internal fixation, the resurfacing prosthesis was no longer an option. To use the resurfacing prosthesis, the hole in Plaintiff's medial tibial plateau had to be filled with bone—not cement—and the knee ligaments had to remain intact. By using cement, Defendant filled the defect but the cement had no potential for becoming bone. As "the body cannot heal to cement," Plaintiff suffered additional bone loss that extended "below the level of attach[ment] with the medial collateral ligament." Moreover, when the cement came loose, as was expected, the resulting hole in Plaintiff's bone was too large to permit use of the resurfacing device.

Based on what Dr. Guyton saw when he operated on Plaintiff's knee and also on his interpretation of her initial x-rays, he was of the opinion that he "could have grafted" her knee. Such bone grafting and use of a buttress plate—rather than cement and screws—"[would] have saved her medial collateral ligaments" and would have made the resurfacing prosthesis a viable option. Dr. Guyton concluded that Defendant's initial treatment of Plaintiff's fractured knee by means of cement and screws was unacceptable and that in so doing, Defendant "fail[ed] to use that degree of skill, care and learning that an ordinarily careful and prudent orthopedist would have used in the same or similar circumstances." As a consequence, Plaintiff was deprived of the opportunity of having the more durable resurfacing prosthesis. Moreover, if the resurfacing prosthesis had been used and if it had failed during Plaintiff's lifetime, it could have been replaced with another type prosthesis "that would have lasted her for her reasonable life expectancy." As it now stands, however, when her present prosthesis fails, Plaintiff will probably not be eligible for another knee replacement due to bone loss and problems with her extensor mechanism. In that event, Plaintiff's knee joint will either be fused solid or will be removed, thus leaving the knee floppy.

Additional facts are given elsewhere when necessary for our analysis of Defendant's points relied on.

## POINT I—CAUSATION

We set forth the pertinent part of Defendant's first point:

"[P]laintiffs failed to make a submissible case when they failed to adduce evidence of 'but for' and proximate causation in that ... *Plaintiffs' only expert* testified without contradiction that the use of a hinge-type (Gueper) prosthesis by ... Defendant was

not negligent, and *further testified that but for the intervening infection, an ordinary complication of knee surgery, ... Plaintiff would not be in her present condition,* yet Plaintiffs' evidence failed to establish that the infection was a result of negligence, and therefore the evidence was insufficient as a matter of law to establish either a 'but-for' or proximate causal relationship between ... Defendant's negligent use of bone cement in the original repair and any injury suffered or sustained by ... Plaintiff." (emphasis added)

■ "To make a submissible case, substantial evidence is required for every fact essential to liability." *Eidson v. Reproductive Health Services,* 863 S.W.2d 621, 626 (Mo.App.1993). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Medical Center, Inc.,* 709 S.W.2d 872, 880 (Mo.App.1985).

In considering whether Plaintiff made a submissible case we review all the evidence in the light most favorable to her and disregard all contrary evidence. *Hiers v. Lemley,* 834 S.W.2d 729, 732 (Mo. banc 1992). We presume Plaintiff's evidence to be true and give her the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Loomstein v. Medicare Pharmacies, Inc.,* 750 S.W.2d 106, 112 (Mo.App.1988).

■ To establish a submissible medical malpractice case, Plaintiff must establish: (1) that the alleged act or omission failed to meet the requisite medical standard of care; (2) that the act or omission was performed negligently; and (3) a causal connection between the act or omission and the plaintiff's injury. *Hiers,* 834 S.W.2d at 732[4].

■ "The 'but for' causation test provides that 'the defendant's conduct is a cause' of the event if the event would not have occurred 'but for' that conduct." *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 860–61[5] (Mo. banc 1993) (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE

LAW OF TORTS, § 41, at 266 (5th ed. 1984)). "Put simply, 'but for' causation tests for causation in fact. Mere logic requires causation in fact." *Id.* at 861.

■ "[T]he 'but for' test continues to apply to the vast majority of cases in Missouri." *Callahan,* 863 S.W.2d at 862. It is the test for causation that "is applicable in all cases except those involving two independent torts, either of which is sufficient in and of itself to cause the injuries, i.e., the 'two fires' cases." *Id.* at 862–63[5].

■ "Proximate cause is that cause which produces a particular injury without the intervention of an independent cause, in the absence of which the injuries would not have been inflicted." *Eidson* at 626 (citing *Vann v. Town Topic, Inc.,* 780 S.W.2d 659, 661 (Mo.App.1989)). "An intervening resulting cause is a new and independent force which so interrupts the chain of events initiated by defendant's alleged negligence as to become the responsible, direct, and proximate cause of the injury." *Id.* at 626[8].

■ With the foregoing principles to guide us, we turn to Defendant's first point. Preliminarily, we note that both the portion of Defendant's point that we have italicized and the argument made thereon mischaracterizes Dr. Guyton's testimony. The testimony to which Defendant alludes is found in his April 12, 1995, deposition. It reads:

"Q. [to Dr. Guyton] [I]n the ordinary course, without the infection, there's absolutely no reason to believe that [Plaintiff] would still not have the offset hinge in her knee today and be using it absent the infection?

"A. That is true."

Defendant cites to this testimony [2] when he argues that "according to Dr. Guyton's own testimony, it was the intervening infection which lead to and created [Plaintiff's] current condition; specifically, Dr. Guyton indicated that but for the infection she would not be in the condition she is today." Defendant's portrayal of what Dr. Guyton said is

---

**2.** In his brief, Defendant cites us to additional deposition testimony of Dr. Guyton to support this argument. However, the testimony alluded to was never read to the jury; hence, it cannot support Defendant's argument as he contends.

incorrect and what he contends about the cited testimony cannot be logically or reasonably inferred therefrom. When earlier Dr. Guyton explained that the resurfacing prosthesis had a longer life expectancy than did the offset hinge device, he stated that about 50 percent of hinge prostheses "are loose at five years." Thus, it was entirely consistent for him to say on April 12, 1995, approximately 37 months after the offset hinge was used, that absent the infection she would still have the offset hinge in her knee "today," i.e., April 12, 1995.

Next, we examine Defendant's claim that Plaintiff did not make a submissible case on the causation element because Dr. Guyton "testified that the use of a hinge-type ... prosthesis by ... Defendant was not negligent." The testimony cited by Defendant reads:

"Q. [by Mr. Oliver] [I]n all events, while you might not have chosen this particular prosthesis yourself, it's one that ordinary, careful and prudent surgeons use; correct?

"A. Yes."

Both the question and the answer are broad and non-fact specific. Plaintiff is entitled to have such testimony viewed in light of other evidence that is favorable to her. *Eidson*, 863 S.W.2d at 626[3]. For example, Defendant called the hinge device a "salvage" prosthesis and agreed with Dr. Guyton's opinion that it was preferable to use the resurfacing type prosthesis when possible. Dr. Peter Bonutti, the orthopedic physician who testified as an expert witness for Defendant, described the offset hinge as "a device that [orthopedic surgeons use] in patients that have ligamentous instability." Dr. Bonutti also testified that a resurfacing device would have been a viable option for Plaintiff if her medial collateral ligament had been intact. On that subject, Defendant testified that when he chose to use cement and screws for internal fixation, Plaintiff had no damage to the cruciate ligaments and no tear, deformity, or detachment of her medial collateral ligament. Plaintiff's cross-examination of Defendant included the following:

"Q. [to Defendant] ... So it's because of the original treatment that you were left with the choice of a salvage prosthesis; isn't that true?

"A. I felt in order to treat the situation as I saw it, this type prosthesis was needed.

"Q. [B]y the time you get to here (indicating), which is Exhibit 1–D, once this fails, all that bone cement's got to come out; right?

"A. It should, yes.

"Q. And then you've got a 55–millimeter gap here and you're talking hinge prosthesis, period, or what Guyton used or something like that. You're not talking resurfacing prosthesis anymore; right?"

"A. No, you're not."

Viewing these facts as true and also taking as true Dr. Guyton's testimony summarized above under "background facts," the jury could have reasonably inferred that Dr. Guyton's answer that ordinary, careful, and prudent surgeons use the offset hinge device simply meant that such surgeons will use that particular prosthesis only when there is no other choice. They could have also reasonably and logically inferred from such evidence that "the situation as [Defendant] saw it" on March 3, 1992, and which mandated a hinge device was caused by his negligence.

Plaintiff's theory of negligence is that Defendant's initial choice of treatment for her fractured knee was unacceptable. Her causation claim is that the alleged negligence deprived her of the opportunity to have successive knee replacements if needed, first with the better long-term resurfacing prosthesis, and followed by some other type of prosthesis. Dr. Guyton's testimony provides support for that theory. Again, treating the testimony of Dr. Guyton summarized under "background facts" as true, it cannot be said that there was no evidence of causation. Contrary to Defendant's argument, the infection was not a new and independent force which so interrupted the chain of events initiated by Defendant's alleged negligence as to become the responsible, direct, and proximate cause of Plaintiff's lost opportunity to have successive replacement knees, starting with the longer-term resurfacing prosthesis. The jury could have logically interpreted Guyton's testimony as follows: "But for" De-

fendant's selection of the screw/cement combination as his method of fixation, if total knee replacement for Plaintiff became necessary as anticipated, the resurfacing prosthesis would have been available as the preferable option initially and other prostheses could have remained in reserve for later use if another replacement became necessary, thus giving Plaintiff the prospect of having successive knee joint replacements.

This court finds that Plaintiff made a submissible case on the causation element. Point I is denied.[3]

## POINT II—EVIDENCE OF PLAINTIFF'S FUNCTIONAL CAPACITY

■ In his second point relied on, Defendant charges the court with error for repeatedly overruling his objections "to the introduction of evidence of [Plaintiff's] past and present ability to perform specific tasks, and functional capacity generally," for failing to sustain a related oral motion for mistrial, and for allowing Plaintiff to reference such evidence in closing argument. We need not consider Defendant's specification of why the trial court's admission of such evidence was erroneous, because we find that Defendant's exception to the action of the trial court was not preserved.

In his brief, Defendant complains that

"Plaintiffs were permitted, over repeated objections of defense counsel ... to introduce extensive testimony of plaintiff and plaintiffs' children regarding [Plaintiff's] condition prior to the November, 1991 fall, and her condition at the time of trial, including detailed explanations of activities in which she was able to participate before the accident and a detailed descriptions [sic] of her present physical limitations."

(transcript citations omitted). According to Defendant, the first of these "repeated objections" occurred during a pretrial conference. The page reference for this "objection" runs for three pages, so we summarize it by saying that there are two topics being considered on the pages referenced by Defendant. The second is not related to Plaintiff's past and present ability to perform specific tasks or functional capacity generally.[4] The first is the admissibility of exhibits 13 and 14, two pictures of Plaintiff's knee taken after a fall on the eve of trial.[5] The basis for Defendant's opposition to the admission of the photographs so far as it pertains to the evidence questioned by this point, is that there would be no foundation for Plaintiff to say that her knee is unstable.

■ Counsel seemed to ask the court for a continuing objection to exhibits 13 and 14, as well as a motion to strike them at the appropriate time. Moreover, we are mindful of the principle that when a party has duly objected to a certain type of evidence and the objection has been overruled, it is not necessary to repeat the objection to further evidence of the same type. *State ex rel. State Highway Comm'n v. Offutt*, 488 S.W.2d 656, 661[5] (Mo.1972). However, counsel did not duly object to the type of evidence Defendant complains of in this point.

The "objection" counsel lodged during the pre-trial conference was an oral motion in limine to exclude a certain type of evidence. As explained by the court in *Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341 (Mo.App.1983), there are ample reasons why objections to the admissibility of evidence made before trial preserve nothing for our review:

"A ruling by the trial court on a motion in limine regarding the admission or suppression of potential evidence is interlocutory

---

**3.** To the extent that Defendant has attempted in the argument section of his brief to raise contentions and issues not reflected in the point relied on, they are not preserved for appellate review. *Berger v. Huser*, 498 S.W.2d 536, 539[2] (Mo. 1973); *First Assembly Church of West Plains v. Ticor Title Ins. Co.*, 872 S.W.2d 577, 581 n. 6 (Mo.App.1994).

**4.** The question of the admissibility of evidence relating to Plaintiff's pain is not raised by Point

II. While there is some discussion of this evidence and its propriety in the argument following Point II, we will not consider it. *See* footnote 3.

**5.** Although Defendant's objections to them were overruled and they were admitted by the court, they were never mentioned or displayed to the jury, and were ultimately withdrawn after both sides had rested.

in nature. The trial court cannot foresee the circumstances under which the matter may be presented during trial, or how trial developments preceding the attempt to introduce the questioned evidence may affect its admissibility. For these reasons, an objection or an offer of proof must be made so that the trial court has the opportunity to consider such circumstances and developments and thus be enabled to make a reasoned and fully-advised decision.... [W]hile a motion in limine has the salut[a]ry purpose of pointing out to the court and to opposing counsel anticipated evidence which may be objectionable, ... a pre-trial ruling thereon ... presents nothing for appellate review unless preserved by timely objection or offer of proof. Failure to make such a timely objection constitutes consent to the admission of the evidence."

*Id.* at 348[14].

We have carefully examined the record to determine whether Defendant lodged a timely objection to the admission of evidence "of [Plaintiff's] past and present ability to perform specific tasks, and functional capacity generally." Based on our review of the testimony of the first witness who testified, Plaintiff, we conclude that no such objection was timely made.

Early in her testimony, Plaintiff was allowed to testify, without objection, that "it's been so long since I got around, you know. And I used to ride my bike and everything like that." Such testimony went to her past ability to perform specific tasks, as well as her past functional capacity.

■ Later on, Plaintiff testified without interruption by defense counsel for nearly two and one-half transcribed pages on various aspects of her present functional capacity and ability to perform certain tasks. She described the metal brace she currently wore on her leg in order to be able to walk and the quad cane she was required to use for balance. She described another Velcro and metal brace that she wore around her home and her limited mobility when she was wearing that brace. Plaintiff also described her inability to navigate a flight of steps without help. Finally, as Plaintiff's counsel was wrapping up this series of questions, Defendant's counsel spoke up:

"Q. Can you go up a flight of steps in, I want to say in a normal type fashion, where you step up with one foot and then step up with the next foot—

"A. No.

"Q. —foot-over-foot as doctors call it?

"A. No. I've never done that. I can't.

"Q. When you say you've never done that, you've never done that since when?

"A. I mean, since I've had this done.

"Q. Okay.

"MR. OLIVER: Judge, my objection to all this is continuing, is it not, based on our—is it not, John, based on our discussions off the record?

"MR. COOK: Your Honor, we've had several discussions about continuing objections, and whatever continuing objections are continuing I think are continuing by the Court's order.

"THE COURT: Yes, sir."

Defense counsel's mistaken belief that he had a continuing objection which pertained to this type of evidence must have stemmed either from the pre-trial ruling we have previously alluded to, or to some other "discussion[ ] off the record" to which we are not privy. In either event, this objection is Defendant's first objection at trial to the type of evidence complained of in Point II, and its lack of timeliness is fatal to the preservation of the error asserted in this point. A party must object at the earliest opportunity to the opposed evidence to avoid waiver of the objection. *Chism v. Steffens*, 797 S.W.2d 553, 559[7] (Mo.App.1990).

Moreover, since Defendant did not state the grounds for his objection and did not request a ruling on his objection when he did not receive one, we progress in chronological order to consider one more piece of testimony which occurs just prior to Defendant's finally stating the grounds of his objection to the type of evidence he asserts was erroneously admitted by the trial court. Plaintiff testified extensively about the activities she enjoyed before the injury in November, 1991, but could not manage now, including walking,

riding a bike, riding a three-wheeler, house-work, yard work, and gardening. Only after Plaintiff's counsel asked a follow-up question about her already-stated inability to work in the garden did Defendant's counsel interject the following: "Judge, there's just no evidence ... to causally connect this up. And I object to it as being without foundation and positively misleading to the jury and move to strike." This objection, finally an articulated objection to this type of evidence, albeit an untimely one, was overruled.

■ While there was much subsequent evidence from Plaintiff and other witnesses concerning "[Plaintiff's] past and present ability to perform specific tasks, and functional capacity generally," such evidence was merely cumulative of the evidence introduced by Plaintiff's testimony admitted without timely objection. "A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Tryon v. McElyea*, 912 S.W.2d 73, 78 (Mo.App.1995). Furthermore, Defendant's assertion that Plaintiff should not have been allowed to reference this evidence during closing argument is likewise without merit, because such argument was not outside the evidence as a result of Defendant's having allowed Plaintiff's testimony to be admitted without objection.

Because Defendant's assertion of error was not preserved by timely objection, we deny Point II.

POINT III—WARRANTY COUNT

Defendant's third point maintains that the trial court erred when it refused to dismiss Plaintiff's "express warranty" count and by allowing Plaintiff to offer evidence in support of that theory. Defendant argues that Missouri does not recognize breach of warranty claims in medical malpractice actions, that a patient has no such cause of action against a physician in Missouri, and that Plaintiff's inclusion of the breach of warranty count was merely pretensive and designed to facilitate

the admission of otherwise inadmissible evidence.

As authority for this argument, Defendant first cites *Girdley v. Coats*, 825 S.W.2d 295 (Mo. banc 1992), focusing on this language: "Traditionally, Missouri does not analyze malpractice in terms of contract law." *Id.* at 296. *Girdley* does not support Defendant's argument. The observation in *Girdley* is not an express holding that a patient can never proceed against a physician on a contract theory. Indeed, there are Missouri cases, albeit ancient, which suggest otherwise: "It is ... competent for the surgeon to make a contract expressly binding himself to cure...." *Vanhoover v. Berghoff*, 90 Mo. 487, 3 S.W. 72, 73 (1887). *See also Davidson v. Biermann*, 27 Mo.App. 655 (1887) (in suit for medical services rendered, defendant prevailed on defense that the treatment was rendered under special contract by which payment depended on patient's recovery); *Ruth v. McPherson*, 150 Mo.App. 694, 131 S.W. 474 (Mo.App.1910) (counterclaim alleging an express contract to heal and cure was recognized but failed for insufficiency of evidence).[6] *Girdley* simply decided that plaintiffs in a "wrongful conception" case could not recover the reasonable cost of raising and educating the child. While *Girdley* rejected the reach of damages pled by the plaintiffs' contract count, it did not preclude the use of a contract theory to recover for the non-negligent breach of a promised good result.

As additional authority, Defendant cites *Barnhoff v. Aldridge*, 38 S.W.2d 1029 (Mo. 1931), *Mullins v. Miller*, 796 S.W.2d 119 (Mo.App.1990), *overruled on other grounds in Mahoney v. Doerhoff Surgical Services*, 807 S.W.2d 503 (Mo. banc 1991), and *Spruill v. Barnes Hospital*, 750 S.W.2d 732 (Mo.App. 1988). The question in *Barnhoff* and *Spruill* was whether a two-year statute of limitations on malpractice actions barred the claim asserted even though each plaintiff styled her petition in contract. Both courts answered yes. The *Barnhoff* court found that although plaintiff attempted to plead a contract action,

---

6. For discussion of *Vanhoover* and *Davidson, see* Howard Schwartz, *The Law of Medical Malpractice in Missouri,* 28 St. Louis U.L.J. 397, 398

(1984); Arnold J. Miller, *The Contractual Liability of Physicians and Surgeons,* 1953 Wash. U.L.Q. 413, 416.

the "gist of the action" was the doctor's wrongful act. *Id.* at 1030. *Barnhoff* held: "The *improper performance* by a physician or surgeon of the duties devolved and incumbent upon him and the services undertaken by him, whether same be said to be under a contractual relationship with the patient arising out of either an express or implied contract or consensual relationship, whereby the patient is injured in body and health, is malpractice, and any action for damages, regardless of the form thereof, based upon such improper act, comes within the inhibition of the two-year statute of limitation." (emphasis added) *Id.* at 1031. The *Spruill* court quoted from and followed *Barnhoff.*

In *Mullins,* a patient sued his dentist without filing the affidavit required by § 538.225, RSMo.1990. After the negligence count was dismissed, the dentist moved to dismiss the counts labeled breach of contract, for money had and received, and conversion. He argued that in effect, those counts sought damages for failure to provide proper dental care. The trial court agreed and dismissed all counts. On appeal, the *Mullins* court quoted from *Barnhoff* and reached this conclusion: "The teaching of *Barnhoff* and its progeny is that an action based on a dentist's *wrongful act* is a tort action for malpractice. Thus, plaintiff's action falls under Chapter 538, Tort Actions Based on Improper Health Care." *Id.* at 120. (emphasis added).

*Barnhoff, Mullins,* and *Spruill* do not support Defendant's argument in Point III. These cases stand for the proposition that plaintiffs who base their action on a medical provider's "wrongful act" or "improper performance" are deemed as pursuing a tort action for medical negligence regardless of how they style their case or frame their pleadings. In contrast, Plaintiff's "warranty count" does not charge Defendant with wrongful conduct or improper performance. Rather, it alleges that he expressly guaranteed or warranted a result, specifically "that his treatment would heal Plaintiff's fractured tibial plateau." As written, Plaintiff's contract count seeks damages for a bad result even if Defendant did not improperly per-

form or act wrongfully, based on the theory that he had agreed to produce a good result under any circumstances. This distinguishes this case from those cited by Defendant.

■ Given the recognition in *Vanhoover, Davidson,* and *Ruth* that a physician may bind himself to a contract to cure, the trial court did not err when it refused to dismiss Plaintiff's warranty count and permitted evidence in support thereof. It is entirely proper for a plaintiff to plead alternative theories for a single injury. *Trien v. Croasdale Constr. Co.,* 874 S.W.2d 478, 480[3] (Mo.App. 1994); Rules 55.10 and 55.06(a).[7] "In fact, under [what is now Civil Rule 55.10], upon the institution of his action a plaintiff may set forth statements of two claims alternatively, even though they are inconsistent, and may pursue such inconsistent claims until in some effective manner he makes an election between such remedies." *State ex rel. Hilleary and Partners, Ltd. v. Kelly,* 448 S.W.2d 926, 931[6] (Mo.App.1969). Certainly, at some point before a case is submitted to the jury, an election must be made. *Buss v. Horine,* 819 S.W.2d 762, 767 (Mo.App.1991). In this case Plaintiff made that election at the close of all the evidence, which was perfectly proper. *See Trien,* 874 S.W.2d at 481.

■ Finally, another reason exists for rejecting Defendant's third point. "Error without prejudice is no ground for reversal." *Neavill v. Klemp,* 427 S.W.2d 446, 448[9] (Mo.1968). Pursuant to Rule 84.13(b), this Court shall not reverse the judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action. *Williams v. Junior College Dist. of Central Southwest Missouri,* 906 S.W.2d 400, 404 (Mo.App. 1995). The denial of Defendant's motion to dismiss could only affect the merits of the action if there was evidence that was improperly admitted based on Defendant's argument that the warranty claim was not a viable theory of recovery in Missouri *and* Defendant was prejudiced by such evidence. Thus, even if the trial court erred in overruling the motion to dismiss, the real question that must be answered is whether the testi-

---

**7.** All references are to Missouri Rules of Court, 1995, unless otherwise indicated.

mony adduced in support of the warranty count prejudiced Defendant. *See Wailand v. Anheuser Busch Inc.,* 861 S.W.2d 710, 716 (Mo.App.1993). The placing of irrelevant evidence before a jury is not a ground for reversal unless it prejudices the complaining party or adversely affects the jury in reaching its verdict. *Williams,* 906 S.W.2d at 404. Prejudicial error occurs only when objectionable evidence affects the result or outcome of the trial. *Riley v. Union Pacific Railroad,* 904 S.W.2d 437, 443[11–12] (Mo.App.1995).

■ The evidence about which Defendant objects came from Plaintiff, her husband, and her daughter. Summarized, their testimony was that on the morning after Plaintiff was hurt and before Defendant was chosen as her treating physician, they were considering whether to seek treatment for Plaintiff in Memphis and so told Defendant, but based upon Defendant's assurances that he could "fix it," they authorized Defendant to proceed as Plaintiff's treating doctor.

Except for conclusory statements in Defendant's brief to the effect that the foregoing evidence was "inflammatory and unduly prejudicial," Defendant makes only two efforts to develop the prejudice prong of point III. First, he argues that such evidence was highly prejudicial as it allowed the jury to speculate that Defendant "was not 'qualified' since there was an adverse outcome[ ] and *[laid] the foundation for a later argument that the bad result was proof of negligence.*" Second, Defendant contends that "[t]he admission of this evidence [prejudiced] the jury against [Defendant] by causing it to focus on the promises which he may or may not have made, that, according to the evidence, he could not keep." Continuing, Defendant insists that "[t]hese assurances have absolutely nothing to do with the quality of care rendered by [Defendant], yet permitted the jury to speculate regarding whether, had these assurances not been given, [Plaintiff] might have gone to a different doctor and achieved a different result." We are not persuaded by these arguments that the questioned evidence was prejudicial to Defendant.

First, the evidence of which Defendant complains in this point was brief, comprising only three and one half pages out of a record that contains approximately 450 pages of testimony. Second, the questioned evidence was not referred to in closing argument. The portion of Defendant's first argument which we have italicized is simply not supported by the record. When examining this record, including the closing argument, we do not find a single instance where Plaintiff's counsel made the argument ascribed to him nor do we find that he ever mentioned the warranty evidence to the jury. Third, defense counsel twice drew the jury's attention to a consent form that Plaintiff signed immediately before her initial surgery. The form, which was before the jury as part of the hospital records, contained this language:

> "[T]he risks involved and the possibility of complications in the treatment of my condition have been fully explained to me and I understand the same. I recognize that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees or assurances have been made to me concerning the result of such procedure(s)."

Finally, and most importantly, the inferences that Defendant claims the jury might have drawn do not flow from the disputed evidence. The questioned evidence does not bridge the inferential gap between a promise to fix Plaintiff's knee and the conclusion that Defendant was not qualified. Nor does it render the jury any more likely to speculate whether Plaintiff would have achieved a good result with a different doctor. We will not presume that the jury was prompted by this evidence to engage in any such illogical speculation.

■ In assessing whether alleged error has affected the merits of an action, appellate courts "view the whole of the record the full range of the evidence and instructions for that determination." *Wulfing v. Kansas City Southern Industries, Inc.,* 842 S.W.2d 133, 155[33] (Mo.App.1992). After looking closely at this record and having then considered the full range of the evidence and instructions given the jury, we conclude that even if the trial court erred when it denied Defendant's motion to dismiss, which in turn led to improperly admitted evidence, such

evidence did not materially affect the merits of the case. We deny point III.

### POINT IV—SHOWING VIDEO TAPE DEPOSITION WITHOUT EDITING

Plaintiff requested that the trial court permit her to show the video tape depositions of Dr. Guyton to the jury without editing from the tape various interspersed colloquy and comments by counsel. Generally, the remarks were made during and as part of an objection to a question, during opposing counsel's response thereto, or both. After viewing edited and unedited versions of the depositions, the trial court sustained Plaintiff's motion and allowed Plaintiff to use the unedited versions. Defendant's fourth point maintains that the trial court committed reversible error in making that ruling. Defendant argues that certain of the "speeches" by Plaintiff's counsel during depositions contained irrelevant material and served only to mislead and confuse the jury. He characterizes certain undeleted material as impermissible "instructions not given by the court, repeated insinuations that the objections of defense counsel were frivolous[,] and mischaracterizations of the deponent's testimony." In summary, Defendant complains that certain of the colloquy and comments of counsel that were not expunged had an improper influence on the minds of the jurors.

In response, Plaintiff points out that Dr. Guyton's depositions were video tape depositions as authorized by Rule 57.03(c). As such, the camera was constantly on Dr. Guyton, thus making it possible for the jury " 'to note [the witness'] attitude reflected by his motions, facial expressions, demeanor and voice inflections.' " *See Langdon v. Wight,* 821 S.W.2d 508, 511 (Mo.App.1991) (citing *United States v. Tunnell,* 667 F.2d 1182, 1188 (5th Cir.1982)). Plaintiff argues that the very nature of the video tape deposition creates the possibility for opposing counsel to constantly object and interject comments during the deposition, but then withdraw the objections and request editing, and by such practice, mislead the jury about the witness' attitude and detract from the effect of the depositions. Specifically, Plaintiff asserts that "[e]ach deletion from the tape tends to give the effect of a witness jerking or reacting to the question in a negative manner." Continuing, Plaintiff points out that if unreasonable objections are made at trial for the purposes of interfering with the flow of testimony, the trial judge is present to control such conduct; moreover, counsel who engages in such practice risks incurring the ire of the jury. Plaintiff suggests, however, that such safeguards are not available in a video tape deposition and that a lawyer may succeed in distorting a witness' testimony if he or she can, with impunity, provoke lengthy colloquy or make spurious objections without the prospect of the jury ever knowing what has happened. Plaintiff contends that from the number of objections and type of comments made by defense counsel during Dr. Guyton's deposition, the trial court could have reasonably and fairly inferred that the main purpose thereof was "to interrupt the deposition and to make the jury, at trial, wonder about all the omissions from the tape." She insists that "[o]nly by playing the tape as it was taken, could the jury understand the witness' responses to both question and objection."

Generally, questions regarding the manner and conduct of witness examination and the conduct of counsel are clearly within the trial court's discretion. *Golian v. Stanley,* 334 S.W.2d 88, 92[5] (Mo.1960); *City of Kansas City, Mo. v. Habelitz,* 857 S.W.2d 299, 301[1] (Mo.App.1993). *See also Sabbath v. Marcella Cab Co.,* 536 S.W.2d 939, 942 (Mo.App.1976). Indeed, trial courts are allowed wide discretion in ruling on the propriety and prejudicial effect of the conduct, comments, and arguments of counsel, and their rulings thereon will generally be deferred to on appeal unless an abuse of discretion is shown. *Wartenbe v. Car–Anth Mfg. and Supply Co.,* 362 S.W.2d 54, 61[7] (Mo. App.1962).

In considering whether a trial court's actions with regard to the argument of counsel are erroneous, appellate courts indulge a liberal latitude, especially in response to argument of opposing counsel. *Doyle v. St. Louis San Francisco Ry. Co.,* 571 S.W.2d 717, 725[13] (Mo.App.1978). "[I]t

is within the province of the judge to determine how the jury might reasonably construe the language used, for language may reasonably convey more than one meaning." *Id.*

In the final analysis, whether the remarks or arguments are so prejudicial as to constitute reversible error depends on the nature of the utterances and the circumstances under which they were made. *Wartenbe,* 362 S.W.2d at 61[9].

"Under Missouri law, depositions of witnesses are used as evidence in all respects as though the witnesses orally testified in open court." *Robertson v. Cameron Mut. Ins. Co.,* 855 S.W.2d 442, 448 (Mo.App.1993); § 492.400, RSMo 1994; Rule 57.07. It follows, therefore, that the rules and principles governing counsel's behavior and conduct at trial apply during the taking of depositions to perpetuate testimony.

With these principles in mind and also bearing in mind the practical problems presented by video tape depositions, we analyze Defendant's fourth point relied on. Defendant points to eleven instances during Dr. Guyton's depositions where he claims that the comments or colloquy of counsel should have been deleted from the video. He places these comments into three categories, the first of which is "instructions not given by the court." The single instance in this category occurred near the beginning of the deposition when Plaintiff's lawyer told Dr. Guyton that any questions asked would call for his medical opinion rather than his personal opinion, and that with respect to any opinion given, counsel wanted Dr. Guyton "to feel qualified and able to give [the opinion] within a reasonable degree of medical certainty." Defendant complains—correctly so—that this was not a question but rather was an impermissible speech. Continuing, Defendant asserts that this "speech" amounted to an "instruction not given by the court." However, we need not decide whether that is a proper characterization of counsel's comments because Defendant neither suggests nor do we find that such comments misdirected the jury. Moreover, Defendant fails to develop any argument tending to show how he was prejudiced by such remarks, and we do not find any prejudice either.

Next, Defendant complains of five instances of improper colloquy or comment in the category of "insinuations that defense counsel objections were frivolous." The following is one of the instances about which Defendant complains and is illustrative of all five occurrences in this category. Early in his deposition, as Dr. Guyton completed his recital of Plaintiff's medical history, defense counsel stated:

"MR. OLIVER: I move to strike. It's a recitation of hearsay from the Doctor's testimony. It's obvious that it came from plaintiff herself. The plaintiff is a known poor historian, and there are numerous facts in the hearsay which are inaccurate. I move to strike it as hearsay and inaccurate.

"MR. COOK: Well, for the Court's benefit, I move to strike Counsel's characterization that [Plaintiff] is a poor historian. I think Counsel is aware that under Missouri Rules of Evidence the history given by a patient to a treating physician is not subject to the hearsay objection. Now, Counsel knows that. He knows that I know that he knows it. So let's move ahead."

This exchange is fairly typical of the other four in this category, in that it occurred as a result of defense counsel making a speech and commenting on the evidence as he made his objection, to which Plaintiff's counsel then responded in kind. Moreover, such exchanges were not confined to the deposition. Throughout this trial, two experienced and highly competent trial counsel represented their clients with equal fervor. As a consequence, the trial court could have reasonably concluded that a reasonable juror would not be misled or inflamed by the deposition exchanges, but instead would view them as part of the ongoing efforts of both lawyers to utilize all applicable rules of evidence in serving as advocates for their clients. Viewed in the context of the entire trial, we are not persuaded that Defendant was denied a fair and impartial trial because this category of exchanges was left in the video tape deposition shown to the jury.

Finally, Defendant lists five incidents of counsel comment or colloquy which he categorizes as "mischaracterizations of deponent's testimony." Defendant cites no authority in suggesting that the trial court's failure to remove these incidents from the video tape played to the jury was an abuse of discretion. Nor do we find any such authority. At trial, the jury heard each and every such exchange, uninterrupted and unedited. The jury could determine for itself whether counsel's characterizations of the deponent's testimony were accurate or not. The jury is instructed to consider the testimony of witnesses as well as other evidence and is able to distinguish between statements of counsel and evidence. *See* MAI 2.01[1978 revision]. In this case, we cannot say that the so-called mischaracterizations of Dr. Guyton's testimony amounted to reversible error.

In reaching our conclusion that the three categories of counsel comments of which Defendant complains did not amount to reversible error, we do not ignore the several cases cited by Defendant. The cases are *Walsh v. Terminal R.R. Ass'n of St. Louis,* 182 S.W.2d 607 (Mo.1944); *Girratono v. Kansas City Public Service Co.,* 251 S.W.2d 59 (Mo. 1952); and *Wilkins v. Cash Register Service Co.,* 518 S.W.2d 736 (Mo.App.1975). However, all are distinguishable from the instant case in that none involved a video tape deposition. Moreover, *Walsh* and *Girratono* involve colloquy between counsel prompted by an attempt to read to the jury part of a written statement to impeach a witness. In both cases, opposing counsel argued in the presence of the jury that reading only part of the statement was improper, that the proponent of such evidence was attempting to mislead the jury, and that all of the statement should be read irrespective of the relevancy to the inquiry at hand. The focus of these cases was the impropriety of counsel's insistence in the presence of the jury that the whole statement should be read. In this case, counsel's arguments on whether edited or unedited video tape depositions should be shown to the jury occurred outside of the presence of the jury. As to *Wilkins,* 518 S.W.2d at 745, which advises that the better practice when dealing with written depositions is to make a preliminary inquiry and rule on objections outside the presence of the jury, it nonetheless found no reversible error from the trial court's failure to follow that procedure:

"Reasonable men could differ with the trial court in the handling of defendant's request, but viewing the totality of the circumstances of this case, the 'free-wheeling' manner in which it was tried by counsel for both parties, the adversary nature of the proceeding, and the fact that defendant's counsel chose a tactical approach to the denial of his request for a pre-ruling on his objections whereby he withdrew or waived most objections, we conclude that it was not thereby deprived of a fair trial by reason of this ruling of the trial court."

*Id.* at 745–746. A thorough review of this record convinces us that the foregoing quote from *Wilkins* is apropos to this case. Certainly reasonable men could differ with the trial court's handling of Plaintiff's request to show an unedited version of Dr. Guyton's deposition, but given the "free-wheeling" fashion in which the deposition was taken by counsel for both parties, we find no prejudice to Defendant from the trial court's ruling. While speech-making by attorneys during depositions, especially when video-taping, is certainly a practice which ought to be discouraged and is frequently impermissible, we do not find that here it rose to the level of depriving Defendant of a fair trial.

There is certainly a higher potential for misleading a jury about a deponent's attitude by editing a video tape deposition, since the jury will see but may not know the reason for a particular response or what can appear to be inappropriate facial expressions, demeanor, or voice inflections of the witness. Here, Defendant prepared an edited version of Dr. Guyton's deposition and placed it in evidence as Exhibit X, presumably so an appellate court could compare it with the unedited tape that was shown to the jury. However, Defendant did not file that exhibit with this court. When an exhibit is omitted from the transcript and is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to the appellant. *Shadow Lake v. Supervisor of*

*Liquor Control,* 893 S.W.2d 835, 839[7] (Mo. App.1995); *In re Marriage of Gourley,* 811 S.W.2d 13, 16 n. 2 (Mo.App.1991). Applying that well-established rule, we take the content of Exhibit X as favorable to Plaintiff's position and to the trial court's ruling and as unfavorable to Defendant. Point IV is denied.

## POINT V—CLOSING ARGUMENT

In Point V, Defendant raises a number of exceptions to statements made by Plaintiff's counsel during his closing argument, asserting that the trial court erred in failing to sustain his objections thereto. Defendant contends that counsel (a) argued outside the evidence, (b) argued outside the instructions, and (c) argued "so as to encourage the jury to find against Defendant notwithstanding the fact that plaintiff's [sic] had failed to establish causation." We reproduce the excerpts of Plaintiff's counsel's argument of which Defendant complains, in the format of Defendant's organizational scheme.[8]

(a) outside the evidence:

(1) "... if you take the steps these doctors, Dr. Geary and Dr. Guyton, give you, they say bone grafting not only should have been done but it should have been done—"

(2) "If he had just left her alone, they could have put a resurfacing prosthesis on it the way it was left. Instead he put a rock in there, half the size of your fist, and killed the surrounding bone—"

(b) outside the instructions:

(1) "... if you believe that this doctor did not know the right technique to use and used the wrong technique and sentenced her to this kind of salvage prosthesis—

. . . .

"Here's how he sentenced her to this kind of dysfunctional knee."

(c) damages without causation:

**8.** Within the framework of that organizational scheme, we need not reproduce Defendant's excerpts (a)(3), (c)(1), and (c)(3), since no objection was timely lodged to those arguments. Failure to object to an argument at the time it is made forecloses the claim of error from consideration.

(2) "What's it worth to be the way she is instead of being able to walk up steps foot-over-foot and walking a mile at a time? What's it's [sic] worth? What's it really worth? You know the pain and disability of being in the hospital, in and out of the hospital, the surgeries."

We will address each of these in turn. Preliminarily, however, we note that the trial court is vested with broad discretion in the area of closing argument, and any challenged comment must be interpreted in light of the entire record. *Wolfe,* 895 S.W.2d at 89[15–16].

As to excerpt (a)(1), which is never discussed by Defendant in either his opening or reply briefs, we find no reason why it might be characterized as "outside the evidence." At the very least, it takes only a minimal inference to arrive at the statement "bone grafting should have been done," from Dr. Guyton's testimony that bone grafting could have been done and that Defendant's choice of bone cement and screws over a bone graft and buttress plate for fixation was a negligent one.

Defendant vehemently objects to counsel's use of the phrase "killed the surrounding bone" in excerpt (a)(2). However, we cannot say that the trial court abused its discretion in deciding that this comment was not outside the evidence given Dr. Guyton's testimony referring to the "level of bone loss which is bone that was lost primarily due to the use of cement for a screw fixation."

With regard to (b)(1), Defendant's objection, explained for the first time in his reply brief, is no more than a reiteration of his argument, made in Point I, that Defendant's choice of prosthesis was non-negligent and that the infection was an intervening cause. To the end of addressing this objection, we need do no more than refer the reader to our discussion above.

*Wolfe v. Central Mine Equip. Co.,* 895 S.W.2d 83, 89[17] (Mo.App.1995). *See also Gilmore v. Union Constr. Co.,* 439 S.W.2d 763, 766 (Mo.1969) (discussing the rationale for the requirement of timely objections to argument).

Finally, we consider excerpt (c)(2). In his reply brief, Defendant asserts that by those words, Plaintiff's counsel was arguing that Defendant's negligence caused all of the subsequent treatment, including removal of the original prosthesis due to infection and installation of a new prosthesis. Defendant urges that this argument was outside the evidence because the infection was not attributable to Defendant. If excerpt (c)(2) is considered in the light of the entire record, there are several reasons why this argument was permissible.

First, contrary to Defendant's claim, Plaintiff's counsel did not say in his (c)(2) argument that the "pain and disability" and "hospital [or] surgeries" about which he was talking were those caused by the infected prosthesis or other past events. Based on evidence in this record, the jury could have properly understood this argument as referencing additional pain, hospitalizations, and surgeries that Plaintiff would experience as a result of not having the resurfacing hinge prosthesis as her first prosthesis. As Dr. Guyton testified, nearly all resurfacing prostheses last longer than ten years. Given Plaintiff's life expectancy, she is currently expected to require removal of the custom "total condylar 3" prothesis somewhere around five years, certainly before ten years, whereas a resurfacing prosthesis would not have required replacement at such an early date or perhaps at all within her lifetime. It was not outside the evidence for Plaintiff's counsel to argue the inference that Plaintiff would have to endure another painful surgery within her lifetime as a result of Defendant's negligence.

Second, based on the evidence in this record, the jury could have reasonably inferred that Plaintiff's counsel was arguing about the pain and disability that Plaintiff would endure in the future when her prosthetic knee would surely have to be removed, leaving her with a fused or "floppy" knee joint.

Finally, our review of the entire record has produced a significant negative implication that tends to show that Plaintiff's counsel was not attempting to argue damages without showing causation for them. We note the complete lack of effort by Plaintiff's

counsel to prove special damages, i.e., hospital expenses for the various surgeries Plaintiff had already undergone. Such a strategy is inconsistent with the breadth attributed to (c)(2) by Defendant. Given the many readings of (c)(2) in the context of the whole record which would make such argument permissible, we cannot say that the trial court abused its discretion in allowing the statement.

We do not find that the trial court abused its discretion in its rulings on closing argument. Point V is denied.

We affirm the judgment.

CROW, P.J., concurs in result and files concurring opinion.

PARRISH, J., dissents in separate opinion.

CROW, Judge, concurring in result.

I concur in the principal opinion in all respects except its holding that the trial court did not err in refusing to dismiss Plaintiff's "warranty count" and receiving evidence in support of that count.

I would not reach that issue because, as underscored by the principal opinion, error without prejudice is no ground for reversal. I agree with the principal opinion's analysis of the prejudice issue and its conclusion that the evidence complained about by Defendant did not materially affect the merits of the case.

PARRISH, Judge, dissenting.

I respectfully dissent. I would grant appellant's Point III.

Appellant filed a motion to dismiss Count III of respondent's amended petition for failure to state a cause of action. The trial court denied the motion. Point III contends this was error.

Count III was an action for breach of contract. It asserted appellant expressly warranted "that his treatment would heal [respondent's] fracture"; that appellant failed to heal respondent's injury and thereby breached his contract.

*Parkell v. Fitzporter,* 301 Mo. 217, 256 S.W. 239, 242 (banc 1923), declares the duty

that arises upon establishment of a physician-patient relationship.

The duty of a surgeon to bring skill and care to the amelioration of the condition of his patient does not arise from contract, but has its foundation in public considerations which are inseparable from the nature and exercise of his calling. Although the relation of physician and patient may be, and is perhaps generally, created by contract, the duty of the physician when he assumes it is fixed by rules which operate independently of its origin.

A breach of that duty is actionable in negligence not in contract.[1] The trial court erred when it denied appellant's motion to dismiss Count III for failure to state a cause of action.

At trial, under the guise that a breach of contract action could be maintained, respondent tendered, and the trial court permitted, the following testimony:

Q. And what was the thrust of that conversation?

A. Well, it was—I heard him telling Dr. Morse that if—he asked him if he could fix—he thought he could fix my knee. And he said, well—well, it wasn't that night. I guess it must have been the next morning. He said—I don't know if I seen Dr. Morse that night or not.

Q. Okay.

A. But it was the next morning when he came in. And he—Dan asked him could he fix it. He said, "If you can't fix it, I know where I can take her to get it fixed." And he said, "Well, I can fix it." And he said, "No doubt." And that's—you know, "If you're not sure, I'll take her somewhere else."

Q. Dan said that?

A. Uh-huh.

Q. That if he wasn't sure he could fix it, he'd take you someplace else?

A. Yes.

Q. Okay. And what did Dr. Morse respond?

A. He said he could fix it.

Q. Okay.

A. No doubt.

Q. Now, you, of course, at that time remembered that you had been to Memphis and gotten a good result from your earlier fracture?

A. Yes, sir.

Q. Did you rely on Dr. Morse saying he could fix this to make a decision to have it fixed here in Kennett rather than—

.    .    .    .    .

A. —you know. I trusted him, yeah.

Q. ... Here's my question. Here's what I want to know: If he had made any other response, if he'd have said, "Well, it's a bad situation and I don't know exactly what can be done" or "maybe yes or maybe no" or "there's no guarantees," if he'd have said anything other than what he did say, what would you have done to have your knee fixed?

A. I would have went to Memphis. Because we was acquainted down there and everything and I knew—I knew the doctors. But the doctor I had when I had knee surgery, he was retired.

Q. So did you have this work done at Kennett? In other words, did Dr. Morse undertake to work on your knee fracture?

A. Yes.

This invited the jury to speculate about whether respondent would have gone to another physician absent these discussions. That issue had no bearing on whether the medical care appellant provided met the standard the law requires. In my opinion

---

1. Although respondent argues she acted in good faith in attempting to plead a breach of contract action, this is questionable since her request for damages did not comply with requirements of Rule 55.05 for contract actions seeking recovery of money. Rule 55.05 states, in applicable part:

> If a recovery of money be demanded, the amount shall be stated, *except that in actions for damages based upon an alleged tort, no*

*dollar amount shall be included in the demand* except to determine the proper jurisdictional authority, but the prayer shall be for such damages as are fair and reasonable. [Emphasis added.]

Count III did not state the amount of damages it sought. Count III demanded "a sum that is fair and reasonable," a statement that would be appropriate in a tort claim.

this testimony, built on the foundation established by the trial court's failure to grant appellant's motion to dismiss Count III, was prejudicial. I would reverse and remand for a new trial.

ON MOTION FOR REHEARING OR, IN THE ALTERNATIVE, TO TRANSFER TO SUPREME COURT OF MISSOURI

PER CURIAM.

In a motion for rehearing or, in the alternative, to transfer this case to the Supreme Court of Missouri, Defendant asserts that this court erred in "holding that Missouri recognizes a theory of recovery against a physician for breach of warranty, i.e., breach of contract to cure...." This argument overlooks the recorded vote on this opinion. Of the three members of this court assigned to this case, only the writer of the opinion declared that Missouri recognizes a theory of recovery against a physician for breach of contract to cure. One judge concurred in the result, expressly declining to reach the breach of contract question and another dissented. As the opinion failed to receive a concurrence of a majority of the judges who voted except as to result, it does not decide the issue and will not be authoritative on this question as Defendant contends. *See Williamson v. Cox*, 844 S.W.2d 95, 98–99[4] (Mo. App.1992); *State v. Bradshaw*, 593 S.W.2d 562, 565[1] (Mo.App.1979). Consequently, we decline to grant a rehearing or transfer for this reason.

After considering Defendant's additional reasons for rehearing or transfer, we deny his post-opinion motion.